MEYER and another, Plaintiffs in error, vs. THE STATE, Defendant in error.

*November 30, 1907—January 8, 1908.*

*Food: Imitation butter: Evidence: Statutes: Construction: Police regulations: "Color:" Acquittal:* Scienter.

1. Under sec. 4607c, Stats. (1898), as amended by ch. 151, Laws of 1901 (denouncing a penalty upon any person who shall sell, etc., any article, product, or compound made wholly or in part of any fat oil or oleaginous substance or compound thereof, not produced from unadulterated milk or cream from the same, and without the admixture of any fat foreign to said milk or cream, which shall be in imitation of yellow butter produced from such milk or cream with or without coloring matter), the prohibitory and descriptive words of the statute are not enlarged by the further provision: "Nothing in this section shall be construed to prohibit the manufacture or sale of oleomargarine in a separate and distinct form and in such manner as will advise the consumer of its real character, and free from coloration or ingredient that causes it to look like butter."

2. Such portion of the statute relating to oleomargarine, in connection with other statutes relating to the same subject matter, is, however, an aid in determining upon what particular ground of police regulation the statute is founded.

3. Such statute relating to oleomargarine is *held* to be a police regulation respecting public safety, that is, relating to the prevention of frauds or imposition and not to the public health.

4. The words "yellow butter" in sec. 4607c, Stats. (1898), as amended by ch. 151, Laws of 1901, are used in their popular, rather than their trade or technical, sense, and define themselves.

5. Yellow butter does not mean all kinds of butter, and hence it is error in a prosecution under sec. 4607c, Stats. (1898), as amended by ch. 151, Laws of 1901, to instruct the jury: "Butter, that is natural butter, as is shown by the undisputed testimony in this case and as is a matter of common knowledge, varies in the degree of yellow from light straw color in winter to a rich light orange yellow in the summer. Colored butter varies from a shade of yellow somewhat more pronounced than the natural color of winter butter to shades higher than the

highest natural color of summer butter; and all these shades
of yellow in butter come within the protection of this law,
and it is equally forbidden to sell oleomargarine in imitation
of the lightest shade of yellow butter, colored or uncolored, as
it is of the most pronounced or intermediate shades."

6. In a prosecution under sec. 4607c, Stats. (1898), as amended by
ch. 151, Laws of 1901, it is error to permit a witness to answer
questions how the article sold by plaintiffs in error compared
in color with butter manufactured in the vicinity for named
foreign markets, and whether it would pass such markets so
far as color was concerned.

7. In a prosecution under sec. 4607c, Stats. (1898), as amended by
ch. 151, Laws of 1901, the inquiry is twofold: (1) Does the
compound in question come within the prohibition of the stat-
ute? (2) Did the accused sell, ship, consign, etc., this com-
pound?

8. In a prosecution under sec. 4607c, Stats. (1898), as amended by
ch. 151, Laws of 1901, if the article claimed to be in violation of
the statute is in imitation of yellow butter, it is immaterial
whether such imitation is brought about by the addition of a
dye or by the selection of ingredients.

9. Color is the impression given to the eye by lines of light of vari-
ous rates of vibration.

10. The words "which shall be in imitation of," used in sec. 4607c,
Stats. (1898), as amended by ch. 151, Laws of 1901, in describ-
ing the contraband compound, imply a conscious imitation in
the manufacture thereof.

[11. Sec. 4607c, Stats. (1898), as amended by ch. 151, Laws of 1901,
contains no words indicating that the prohibited acts must have
been knowingly or wilfully done. What would be the conse-
quence to one who sold or shipped in entire ignorance of the
fact that the article was not butter and who had no intention
to sell or ship any compound in imitation of yellow butter, not
determined.]

12. In a prosecution under sec. 4607c, Stats. (1898), as amended by
ch. 151, Laws of 1901, it is not error to refuse to direct a ver-
dict of acquittal when there was evidence from which the jury
would be authorized to infer conscious imitation in the manu-
facture of the compound; and that the accused had knowledge
that the compound was not butter, and in fact sold or shipped it.

ERROR to review a judgment of the circuit court for Jef-
ferson county: GEORGE GRIMM, Circuit Judge. *Reversed.*

Error to review the conviction of the plaintiffs in error. The information charged that the plaintiffs in error (hereinafter called defendants) at the county of Jefferson did unlawfully, by themselves, their agents and servants, have in their possession with intent to sell, and did offer and expose for sale, and did sell, a certain article, product, and compound which was made partly out of fat oil and oleaginous substances and partly out of a compound thereof, and neither the said article, product, or compound, nor the said fat oil and oleaginous substance, nor the said compound thereof was produced from unadulterated milk or from cream and unadulterated milk, and said article, product, and compound and said substance of said compound contained the admixture and addition of fat foreign to unadulterated milk and foreign to unadulterated cream, and said article, product, or compound was then and there in imitation of yellow butter, with or without the coloring matter, such butter being produced from said unadulterated milk or cream from the same, etc.; that said article was in fact oleomargarine and in imitation of yellow butter, etc. There was a verdict of guilty, and certain specific errors hereinafter noted are assigned in the reception and rejection of evidence, in refusing to direct a verdict of not guilty, and in instructing the jury.

Among other references plaintiffs in error cited the following: *State ex rel. S. B. & L. M. S. C. & H. Co. v. Comm'rs,* 34 Wis. 162; *Minis v. U. S.* 15 Pet. 423, 4 Rose's Notes, 121; *Cliff v. U. S.* 195 U. S. 159, 25 Sup. Ct. 1; *Brown v. C. & N. W. R. Co.* 102 Wis. 137, 77 N. W. 748, 78 N. W. 771; *Plumley v. Massachusetts,* 155 U. S. 461, 15 Sup. Ct. 154; sec. 4607d, Stats. (1898); *Louisville & N. R. Co. v. Comm.* 99 Ky. 132, 35 S. W. 129, 33 L. R. A. 209; *L. & N. R. Co. v, R. R. Comm'n,* 19 Fed. 679; *R. R. Comm'n Cases,* 116 U. S. 307, 336, 6 Sup. Ct. 334, 388, 1191; *Tozer v. U. S.* 52 Fed. 917; *Yick Wo v. Hopkins,* 118

U. S. 356, 6 Sup. Ct. 1064; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 107 N. W. 500; *Wis. Keeley Inst. Co. v. Milwaukee Co.* 95 Wis. 153, 70 N. W. 68; *C., B. & Q. R. Co. v. People ex rel. Drainage Comm'rs,* 200 U. S. 561, 26 Sup. Ct. 341; *McCray v. U. S.* 195 U. S. 27, 24 Sup. Ct. 769; *Schollenberger v. Pennsylvania,* 171 U. S. 1, 18 Sup. Ct. 757; *Powell v. Pennsylvania,* 127 U. S. 678, 8 Sup. Ct. 992; *Lochner v. New York,* 198 U. S. 45, 25 Sup. Ct. 539; *Mugler v. Kansas,* 123 U. S. 623, 8 Sup. Ct. 273; *Collins v. New Hampshire,* 171 U. S. 30, 18 Sup. Ct. 768; Tiedeman, Police Power, 510; *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499; *Holden v. Hardy,* 169 U. S. 366, 18 Sup. Ct. 383; sec. 4607e, Stats. (1898).

Among other references defendant in error cited the following: Sec. 4607c, Stats. (1898); *Leisy v. Hardin,* 135 U. S. 100, 10 Sup. Ct. 681; *Capital City D. Co. v. Ohio,* 183 U. S. 238, 22 Sup. Ct. 120; *In re Rahrer,* 140 U. S. 545, 11 Sup. Ct. 865; Act May 9, 1902, ch. 784, 32 Stats. at Large, 193 [U. S. Comp. Stats. Supp. 1907, p. 636]; *Harrington v. Smith,* 28 Wis. 43; *State v. Shove,* 96 Wis. 1, 70 N. W. 312; *Chippewa B. Co. v. Durand,* 122 Wis. 85, 99 N. W. 603; *Canterbury v. N. W. Mut. L. Ins. Co.* 124 Wis. 169, 102 N. W. 1096; *Lehmann v. Farwell,* 95 Wis. 185, 70 N. W. 170; *Von Rueden v. State,* 96 Wis. 671, 71 N. W. 1048; *Brown v. C. & N. W. R. Co.* 102 Wis. 137, 77 N. W. 748, 78 N. W. 771; *State v Hartfiel,* 24 Wis. 60; Clark, Crim. Law, 68, 70; *U. S. v. Anthony,* 11 Blatchf. 200; *Douglass v. State,* 4 Wis. 387; *Hannon v. State,* 70 Wis. 448, 36 N. W. 1; *Barnard v. State,* 88 Wis. 656, 60 N. W. 1058; *Spear v. Sweeney,* 88 Wis. 545, 60 N. W. 1060.

*Charles Quarles,* for the plaintiffs in error.

For the defendant in error there was a brief signed by *Olin & Butler* and *L. E. Gettle,* of counsel, and oral argument by *J. M. Olin.*

TIMLIN, J. Sec. 4607c, Stats. (1898), as amended by ch. 151, Laws of 1901, under which the defendants were convicted, and so far as material here, provides that any person who "shall by himself, his agent or servant, render or manufacture, sell or solicit or accept orders for, ship, consign, offer or expose for sale, or have in possession with intent to sell, any article, product or compound made wholly or partly out of any fat oil or oleaginous substance or compound thereof, not produced from unadulterated milk or cream from the same, and without the admixture or addition of any fat foreign to said milk or cream, which shall be in imitation of yellow butter produced from such milk or cream with or without coloring matter," shall be punished, etc. "Nothing in this section shall be construed to prohibit the manufacture or sale of oleomargarine in a separate and distinct form and in such manner as will advise the consumer of its real character, and free from coloration or ingredient that causes it to look like butter."

We cannot consider the last-quoted sentence as enlarging in any degree the preceding prohibitory or descriptive words of the statute. Manufacturing, selling, or having in possession with intent to sell a described product is prohibited. Following this by a provision that the preceding words shall not be construed to prohibit the manufacture or sale, etc., of oleomargarine in a certain manner and of a certain kind merely indicates that in the exercise of abundant caution the legislature forbade the extension of the prohibitive mandate of the statute so as to take in or include that which is described as excluded. There is a common form of expression often found in statutes and other writings where a general word or words followed by an excepted thing or instance is somewhat broadened by such exception because of the inference that the exception noted is the only exception. But the form of expression under consideration is not within that rule. This last sentence may, however, in connection with other statutes re-

lating to the same subject matter, such as sec. 4607d, Stats. (1898), perform some office as an aid in construction; that is to say, in determining upon what particular ground of police regulation these statutes are founded, and whether or not the legislature intended to recognize as lawful in this state the manufacture, possession, and sale of oleomargarine as a commodity subject to the regulations found in the statutes.

It is established by the evidence and conceded upon the argument that the oleomargarine in question is a healthful food product compounded of oleo oil extracted from beef tallow, neutral lard, cotton-seed oil, and salt. The statutes referred to recognize the right to manufacture, sell, and deal in this product. The question whether the legislature possesses the power to forbid its manufacture, sale, or use in this state is not before us. It being conceded that the product contains no ingredient injurious or dangerous to health, and the statutes containing provisions recognizing the right to sell, but requiring the seller to disclose the nature of the article sold, and forbidding the product to be in imitation of yellow butter, it must follow that this police regulation respecting the manufacture and sale relates, not to the public health, but to the public safety, that is, to the prevention of frauds or imposition. The statute must be construed accordingly. It was known to the legislature when this law was enacted that butter varies in color from nearly white to yellow. The compound prohibited is only that kind of oleomargarine which shall be in imitation of yellow butter. The statute apparently recognizes the right of a producer of whitish or light-colored butter to escape from the competition of oleomargarine by dyeing his butter yellow. This has some bearing upon the construction of the statute. But the same statute authorizes the sale of oleomargarine unless it shall be in imitation of yellow butter. The words "yellow butter" require no definition to explain their meaning. They are used in this statute in the popular, rather than in any trade or technical, sense. They

define themselves.   And first of all it must be obvious that yellow butter does not mean all kinds of butter.   Yet the trial court instructed the jury as follows:

"Butter, that is, natural butter, as is shown by the undisputed testimony in this case and as is a matter of common knowledge, varies in the degree of yellow from light straw color in winter to a rich light orange yellow in the summer. Colored butter varies from a shade of yellow somewhat more pronounced than the natural color of winter butter to shades higher than the highest natural color of summer butter; and all these shades of yellow in butter come within the protection of this law, and it is equally forbidden to sell oleomargarine in imitation of the lightest shade of yellow butter, colored or uncolored, as it is of the most pronounced or intermediate shades."

Here the jury are informed that natural butter, as a matter of common knowledge, varies between certain shades of yellow.   This must have been understood by the jury to mean all natural butter.   This is the ordinary and natural import of the language.   It may be that there is no purely white butter, and that placed alongside of white paint the whitest butter would show a yellow tinge, and it may be that light straw color approximates white but never quite reaches it.   But after having assumed this to be true and after having thus described butter generally, when the court charged the jury that it was forbidden to sell oleomargarine in imitation of the lightest shade of yellow butter, colored or uncolored, as much as it was forbidden to sell it in imitation of the most pronounced or intermediate shades, he added to the statute something not found therein, and it laid down a rule of law which, if followed by this court, would go far to convict the lawmakers of having, under pretense of making a police regulation to prevent fraud, enacted a law to exclude all competition of oleomargarine with all kinds of butter.   This was error.

We are also convinced that the trial court erred in the reception of evidence.   After the witness W. D. Hoard testified

that he was familiar with the shade of yellow butter that is manufactured and sold in Wisconsin for the markets of Chicago, Elgin, and New York, he was shown the oleomargarine in which the defendants had been dealing and which was offered and received in evidence as Exhibit A, and asked: "Q. How does that article, Exhibit A, compare in color with the color of butter that is manufactured here in this part of the state for those markets?" An objection to this question was overruled, and we consider that ruling erroneous for reasons to be given. The witness J. G. Moore was asked: "Q. I will ask you to state in your judgment whether Exhibit A would pass as far as color is concerned for the markets of Elgin, New York, Milwaukee, and Chicago?" There was similar error in overruling an objection to this question. The samples of cotton-seed oil, Exhibit 7, light-colored oleo oil, Exhibit S, yellow oleo oil, Exhibit 9, and neutral lard, Exhibit 10, were properly received in evidence, because the testimony of the witnesses positively identified them as such oils and lard, and it was shown they were ingredients entering into the manufacture of oleomargarine generally and of the article in question. The experimental Exhibits F and G were also properly admitted in evidence, and the same is true of Exhibits H and 11. The inquiry in a criminal prosecution under this statute may for the purpose of analysis be divided into two branches: (1) Does the compound in question come within the prohibition of the statute? (2) Did the accused sell, ship, consign, etc., this compound?

1. With reference to the first branch of the inquiry, viz.: Is the article in question an article, product, or compound made wholly or partially out of any fat oil or oleaginous substance not the product of milk or cream, and which is in imitation of yellow butter? It does not tend to establish the affirmative of this simple issue of fact, but rather to confuse it, when evidence is offered to show how the article in question compares in color with the color of butter that is manu-

factured in this part of the state for the markets of Chicago,
Elgin, and New York. The article is to be compared with
yellow butter by direct testimony of any person who is able
to testify on the subject, and that will include all ordinary
witnesses except those who show affirmatively their lack of
knowledge or some degree of color blindness. These reasons
exclude any evidence in regard to whether or not the article
in question would pass as far as color is concerned for the
markets of Elgin, Chicago, Milwaukee, and New York, or in
any other market. Such evidence tends to lead the jury away
from the true point of inquiry, and, having received the sanc-
tion of the court by his ruling admitting it and thereafter in
the charge to the jury, must be deemed to have had a prej-
udicial effect. The jury were thus led to compare the article
or compound in question, not with the terms of the statute,
but with some rule or criterion not found in the statute. It
would be adding to the statute to construe it as prohibiting the
sale of a compound in imitation of any very light shade of
yellow butter or in imitation of some shade of yellow butter
which met the demands of the market or the standard of the
operators at Elgin or elsewhere, if such shade or standard was
not in fact yellow butter within the plain and popular mean-
ing of these terms. If such standard was yellow butter within
the ordinary and popular meaning of these terms, then the
evidence was immaterial but misleading.

One of the contentions of plaintiffs in error is:

"The court erred in instructing the jury that, although the
color of Exhibit A was produced solely by its ingredients,
they were to consider the claim made by the state 'that the in-
gredients were so selected and used in the manufacture of the
oleomargarine sold, in such manner and in such quantities
and proportion as to produce the oleomargarine so sold
which was then and there in imitation of yellow butter.' "

The question whether the article sold by the defendants
was the identical thing which is contraband by statute must

be determined by the testimony of witnesses who have seen it
or by the testimony of witnesses aided by an inspection of the
article itself, and its resemblance to yellow butter is a factor
in such determination. If the article is in imitation of yel-
low butter, it matters not whether such imitation is brought
about by the addition of a dye or by the selection of ingre-
dients. Color is the impression given to the eye by lines of
light of various rates of vibration. The reason for the natural
color of bodies is a difficult subject and one that is scarcely
yet understood. It has perhaps some relation to the molec-
ular or atomic structure of such bodies, but there is no scien-
tific distinction, so far as producing color is concerned, be-
tween imitating or producing color by the addition of an
ingredient known as a dye and added for the purpose alone
of producing a given color and the selection and addition of
an ingredient which performs the same coloring function but
at the same time adds other qualities to the compound. The
words "which shall be in imitation of," used in describing the
contraband compound, imply a conscious imitation in the
manufacture thereof. If one forming a compound of several
ingredients knowingly select and use an ingredient which im-
parts to the compound the color of yellow butter, he having
choice of ingredients, he will have made his compound in
imitation of yellow butter just as well as if he selected a dye.
There is, however, this difference, viz., proof of the presence
of the dye, which can have no other function than that of
producing color, shows the conscious imitation quite clearly,
while proof of the selection of the ingredients which pro-
duced the color of yellow butter, the person selecting having
a choice of ingredients, is a fact from which the jury is au-
thorized to infer a conscious imitation notwithstanding such
ingredient so selected has other qualities or is in one of its
forms or in one of its colors a necessary ingredient of oleo-
margarine. Whether or not the article in question is in imita-
tion of yellow butter cannot be determined alone by its re-

semblance to yellow butter, but resemblance aided by evidence of the existence of a dye as one of its ingredients, or resemblance aided by evidence of the existence of available necessary ingredients which will not impart to the compound the color of yellow butter and of the existence of other available ingredients which will impart to the compound the color of yellow butter, may be considered by the jury as establishing or tending to establish conscious imitation by selection of ingredients. What is yellow butter and whether the article in question is in imitation of yellow butter are questions of fact. The trial in the circuit court digressed far from these simple and sufficient inquiries.

2. Did the accused sell, ship, etc.? Upon this branch of the inquiry different questions arise. The statute declares unlawful the mere act of selling, shipping, etc., the unlawful compound, and contains no words to indicate that such sale or shipment must have been knowingly or intentionally made. What would be the consequence of a sale, shipment, etc., by one who was entirely ignorant of the fact that the compound was not butter and had no intention to sell or ship oleomargarine or any other compound in imitation of butter we do not determine, because no such question is before the court. But upon the error assigned in refusing to direct a verdict of acquittal we are required to pass upon the question whether there was in the case at bar a *prima facie* case made against the accused, and we think there was, because there was evidence from which the jury was authorized to infer conscious imitation in the manufacture of the compound as herein indicated, and because there was evidence tending to show that the accused had knowledge that the compound in which they were dealing was not butter but oleomargarine and that it resembled yellow butter. Upon this second branch of the inquiry, resemblance to yellow butter, together with knowledge that the compound is not butter, with proof of the fact of selling, shipping, etc., will consti-

tute a *prima facie* case. But it will be necessary, of course, to cover by the proof both branches of the inquiry. We therefore find no error in refusing to direct a verdict of acquittal. This applies to each of the defendants. Other questions are discussed in the briefs, but the foregoing renders their separate discussion here unnecessary.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded for a new trial.