STATE v. HAMMOND PACKING COMPANY.[1]

August 14, 1908.

Nos. 15,577—(28).

**Oleomargarine—Act Constitutional.**

Section 1753, R. L. 1905, which prohibits "the manufacture or sale of oleomargarine * * * which is made or colored to imitate yellow butter," construed in connection with sections 1754 and 1755, which require that packages of oleomargarine be labeled and that its use be published on bills of fare and in placards, is *held* not to be unconstitutional, as prohibiting a branch of industry not injurious to the community and not fraudulently conducted.

[1] Reported in 117 N. W. 606.

**Same.**

> This enactment is valid, as one designed to prohibit the manufacture and sale of a product intended to imitate yellow butter in a form and manner likely and intended to deceive and defraud. It seeks to suppress false pretenses and to promote fair dealing in the manufacture and sale of an article of food. Plumley v. Massachusetts, 155 U. S. 461, followed and applied.

**Same—Evidence.**

> To sustain a conviction under that law, it is not sufficient to prove that by the use of wholesome, necessary, and recognized ingredients there resulted between yellow butter and the article manufactured and sold as oleomargarine a resemblance in qualities inherent in the articles and common to both.

**Same.**

> The evidence in this case is *held* not to have been sufficient to sustain a conviction.

Defendant was convicted in the municipal court of Minneapolis, Waite, J., of unlawfully selling to one H. S. Toy oleomargarine made and colored to imitate yellow butter. From the judgment of conviction, defendant appealed. Reversed.

*Henry Veeder, Frank B. Kellogg, C. A. Severance,* and *Robert E. Olds,* for appellant.

The appellant cannot be convicted except upon this hypothesis: That there exists a valid legislative prohibition upon the manufacture and sale of a certain wholesome food product for the reason that it resembles a particular grade of another food product, the resemblance being wholly unintentional as well as a necessary consequence of its manufacture from essential ingredients without any conscious manipulation thereof and without the employment of artificial coloring matter. A. The stipulation recites: 1. That the sample involved in this case was "a healthful and wholesome article of food." 2. That it was made up of only commonly recognized essential ingredients mixed in the usual and necessary proportions. 3. That there was no manipulation or selection of such ingredients. 4. That the substance contained no artificial coloring matter whatever. 5. That the sample in question was "substantially the same in color and appearance as some

butter which was being sold on the market" at the same time and place. 6. That it is impossible to manufacture oleomargarine so as not to resemble some grades of butter. B. The actual sample sold by the appellant which is before. the court resembles only the lighter grades of butter.

To jeopardize the validity of the statute by construing it as a prohibition upon the sale of a wholesome food product, as above suggested, is unnecessary, unwarranted by its terms, and in violation of well-settled principles for the construction of penal statutes.

A. The statute was obviously designed to reach only deliberate and intentional imitations of yellow butter. 1. It expressly recognizes oleomargarine as a legitimate article of trade. R. L. 1905, §§ 1754, 1755. 2. The history of the oleomargarine industry shows that by the time the law was passed oleomargarine had become a well recognized staple article of food and commerce. Schollenberger v. Pennsylvania, 171 U. S. 1. 3. The history of legislation on the subject in Minnesota shows a consistent progress from an attitude of absolute prohibition to one of enlightened toleration and reasonable regulation. a. The 1885 law was prohibitory in character and was sustained on the theory that oleomargarine was unwholesome. Butler v. Chambers, 36 Minn. 69. b. By the 1891 law, known as the "Pink law," the legislature advanced to an attitude of cynical toleration. This law, which was sustained in State v. Horgan, 55 Minn. 183, was subsequently repealed after the New Hampshire law, from which it was copied, had been declared unconstitutional as to interstate commerce by the supreme court of the United States. Collins v. New Hampshire, 171 U. S. 30. c. All recent enactments have been addressed to the prevention of direct fraud and deception through the selling of oleomargarine as and for butter. Laws 1899, c. 295, §§ 16, 20; Laws 1901; cc. 78, 155; Laws 1903, c. 155, §§ 19, 20, 24; R. L. 1905, §§ 1753, 1754, 1755. 4. The present law applies only to imitations of yellow butter; and speaks of "prohibited ingredients," thereby implying conscious imitation by the deliberate use of nonessential ingredients for purposes of imitation. 5. Similar laws in other jurisdictions have been construed as aiming only at intentional imitations rather than at resemblances due to the use of essential ingredients. a. Massachusetts: Com. v. Hinburg (Sup. Ct. Suffolk County)

(not reported); Plumley v. Massachusetts, 155 U. S. 461. b. Michigan: Bennett v. Carr, 134 Mich. 243. c. Wisconsin: State v. Mitchell, Cir. Ct. Grant County (not reported); Meyer v. State, 134 Wis. 156, 114 N. W. 501. d. New Jersey: Bayles v. Newton, 50 N. J. L. 548. e. New York: People v. Arensberg, 105 N. Y. 123; People v. Meyer, 44 App. Div. 1; People v. Marx, 99 N. Y. 377. f. Pennsylvania: McCann v. Com., 198 Pa. St. 509; Com. v. Mellet, 27 Pa. Super. Ct. 41; See also Schollenberger v. Pennsylvania, 171 U. S. 1. 6. The only case apparently stating the contrary doctrine, State v. Armour, 124 Iowa, 323, is readily distinguished. a. The Iowa statute there involved expressly prohibited the sale of any substitute for butter having a yellow color. b. The statute failed to recognize oleomargarine as such. c. The court found that the butter which gave the oleomargarine involved its color was not an essential ingredient, and that it was used for the express purpose of giving the product the semblance of butter. d. The court conceded the invalidity of an act which is prohibitory rather than regulative.

B. The construction now contended for by the state would mark a reversion to the earlier policy of absolute prohibition based upon the discarded notion that oleomargarine is an unwholesome article of food. Cf. Schollenberger v. Pennsylvania, supra. C. The gradual shifting of the standard of color for butter from deep yellow at the time the law was enacted to the lighter shades which now prevail, cannot be permitted to operate so as to bring within the inhibition of the law that which did not fall within its inhibition before. State v. Emery, 55 Oh. St. 364. D. Even if the language of the statute is conceded to be susceptible to the state's interpretation, it cannot be so construed in view of the well established rule of strict construction of penal statutes. Sutherland, St. Const. §§ 349, 358; Hunt v. Burns, 90 Minn. 172 (semble); Ferch v. Victoria Elevator Co., 79 Minn. 416 (semble).

If construed so as to call for a conviction upon the facts here presented, the law is invalid under the constitutions both of Minnesota and of the United States. A. The right to follow any ordinary calling of life may be reasonably regulated, but it cannot be denied even under the guise of an exercise of the police power. People v. Marx, 99 N. Y. 377; People v. Gillson, 109 N. Y. 389; Colon v. Lisk, 153 N.

Y. 188; People v. Hawkins, 157 N. Y. 1; People v. Biesecker, 169 N. Y. 53; Allgeyer v. Louisiana, 165 U. S. 578; Lochner v. New York, 198 U. S. 45; Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co., 111 U. S. 746; Yick Wo v. Hopkins, 118 U. S. 356; 1 Tiedeman, State & Federal Control of Persons & Property, pp. 517, 254, 510; Id. vol. 2, p. 1045; Freund, Police Power, p. 56. B. The mere fact that unscrupulous persons might attempt to utilize oleomargarine for purposes of fraud or illegal gains does not create the right to forbid the manufacture and sale of the article on its merits for what it is. Schollenberger v. Pennsylvania, supra; Tiedeman, State & Federal Control loc. cit.; Freund, Police Power, loc cit. C. A review of the Minnesota decisions on the subject shows that this court has not departed from the principles above mentioned. 1. The early case of Butler v. Chambers did not decide the question now raised. a. The case was decided on demurrer to the answer which did not set up that oleomargarine was a wholesome article of food. b. The court assumed that oleomargarine contained unwholesome ingredients, and made its decision on that theory. c. At the time of the decision oleomargarine had not established itself as an article of commerce or demonstrated its wholesomeness as an article of food. Schollenberger v. Pennsylvania, supra. 2. The subsequent decisions of the court show that Butler v. Chambers has never been understood as establishing the power of the legislature to prohibit the manufacture or sale of a wholesome article of food on its merits. a. The various laws relating to the labeling of food products have been sustained solely because they were reasonable regulations rather than prohibitions upon the sale of healthful articles. Stolz v. Thompson, 44 Minn. 271; State v. Aslesen, 50 Minn. 5; State v. Hanson, 84 Minn. 42. b. The cream law, which is prima facie more strictly prohibitory in its terms than the oleomargarine law, has been sustained only by construing it as fixing a standard for the sale of cream as cream. State v. Crescent Creamery Co., 83 Minn. 284; State v. Tetu, 98 Minn. 351. c. Both the majority and the minority of the court in State v. Hanson, supra, conceded the principle that any construction which involved prohibiting the sale of a healthful article would render the statute in question unconstitutional. See opinion, pages 46, 47, 50.

*Edward T. Young,* Attorney General, *George T. Simpson,* Assistant Attorney General, *Frank Healy,* City Attorney, *Clyde P. White,* Assistant City Attorney, and *A. C. Finney,* for the state.

Conceding that State's Exhibit "B" is a harmless article of food, nevertheless the power still resides in the state to prohibit the manufacture and sale of the same within its borders, for the reason that it so closely resembles yellow butter as to put a premium upon the sale by unscrupulous dealers, and upon the purchase by unsuspecting, ignorant people of the same as and for yellow butter. Defendant insists that it is necessary to construe section 1753 as a complete prohibition upon the sale of oleomargarine. This the state does not concede; for the state suggests that the statute may be considered as a regulation rather than a prohibition upon the traffic.

Under sections 1753, 1754, 1755, R. L. 1905, it is true that the statute permits the sale of oleomargarine under certain safeguards as to branding and the like, but it is also true, to which fact defendant does not, naturally, call the particular attention of the court, that the same statute prohibits the sale of oleomargarine when "in semblance of yellow butter." That is to say oleo may be sold in Minnesota under these statutes when branded as such, and when it does not look, taste, smell or feel like "(imitate) yellow butter." Now, it appears from the stipulation that oleomargarine can be made so as not to resemble yellow butter; and in evidence thereof the state offered State's Exhibit "A," which was received and is a specimen of the uncolored white oleomargarine. The industry therefore consists of two branches, one given over to the manufacture of white oleomargarine which does not resemble yellow butter, and the other given over to the manufacture of yellow oleomargarine which does resemble yellow butter. It is not claimed by the state that yellow oleomargarine resembles all grades of yellow butter, but it is claimed that it does resemble some grades of yellow butter and is therefore within the words of the statute. Thus having two branches to the industry, the state suggests that such statute, applying as it does only to one part of the traffic, is therefore not a prohibition upon the traffic, but is simply a regulation thereof and is to be viewed in the same light as any other regulation, such as branding. Of a certainty it is a regulation tending to insure the public against fraud and deceit. It does not destroy the in-

dustry, but permits the same to proceed under a reasonable safe-guard; namely, that the product shall not resemble yellow butter. Under the admitted facts in this case, such a construction is permissible and therefore constitutional. Stolz v. Thompson, 44 Minn. 271; State v. Aslesen, 50 Minn. 5; State v. Hanson, 84 Minn. 42.

B. If section 1753, when properly construed, be considered as prohibitive, yet the same is within the power of the state.

We assume that it will not be seriously contended that the police power extends only to the prohibition of food products that are deleterious to health; but if defendant so contends the state insists that the attribute of sovereignty may be invoked to prevent all practices which deceive or which may tend to the deception of the public, and lead them to believe that they are purchasing a food product, in this case butter, when they in reality receive oleomargarine. While the statute may seek to regulate the traffic by notices to persons purchasing oleomargarine, and by directing that the product, when sold, shall only be contained in branded boxes, yet the unscrupulous dealer is abroad in the land, and the man who cannot read wants butter as well as the man who can, and, not being able to distinguish between the yellow oleomargarine and the yellow butter, has the former put off upon him either at a lower price, or perhaps at the price of yellow butter, and is thereby in the latter instance certainly defrauded. State v. Addington, 12 Mo. App. 214, 222.

From the stipulation it appears that at the time of the sale of State's Exhibit "B" yellow butter was on sale in the city of Minneapolis, and in fact the two were therefore competing for the market. The oleomargarine in question was being sold for about ten cents per pound less than its neighbor, yellow butter. Such being the situation, even. considering that the oleomargarine in question was branded by the law, the court will appreciate how easily the one might be sold in place of the other and the public defrauded; and while the legislature would probably not have the power to prohibit the sale of a food product which was not in itself deleterious to public health, nor of such a nature as to readily lend itself to fraudulent practices, the legislature unquestionably has the power, where such food product is of such a nature as to be fraudulently sold as a substitute for another food product, to regulate its sale so as to preclude it being put to such fraudu-

lent use. State v. Wagenhals, 86 Minn. 399. And it is immaterial whether the right to sell such product, as suggested by defendant, be a natural right or not. State v. Capital City, 62 Oh. St. 350, 57 L. R. A. 181; Butler v. Chambers, 36 Minn. 69; State v. Armour, 124 Iowa, 323.

The question for the legislature was whether it should permit the sale of yellow oleomargarine under such safeguards as branding, or the like, and thus protect the public from deceit and fraud; or whether in order to protect the public therefrom, it was necessary to absolutely prohibit the sale of yellow oleomargarine, and the legislature having determined that question, it is not for the courts to set such determination aside. It is a legislative and not a judicial function. Powell v. Pennsylvania, 127 U. S. 678; Com. v. Huntley, 156 Mass. 236; Cook v. State, 110 Ala. 40; Palmer v. State, 39 Oh. St. 236; State v. Capital City, 62 Oh. St. 350; State v. Bockstruck, 136 Mo. 335; Capital City Dairy Co. v. Ohio, 183 U. S. 238; State v. Schlenker, 112 Iowa, 642.

JAGGARD, J.

Complaint was filed against the defendant for violation of the following sections of the state dairy and food laws: Section 1753, R. L. 1905, provides: "The manufacture or sale of oleomargarine, butterine, or similarly constituted butter substitute, which is made or colored to imitate yellow butter is prohibited. Every violation of the provision of this section shall be deemed a misdemeanor, the punishment whereof shall be a fine of not less than fifty dollars or imprisonment for not less than sixty days." Section 1754 provides that each wrapper or receptacle in which a butter substitute shall be kept for sale or sold shall be plainly and conspicuously branded by stamp or label with the word "oleomargarine" or "butterine" in the English language of described type. Section 1755 requires every establishment using such a substitute to cause the word "oleomargarine" or "butterine" or other substitute to be plainly printed in the English language in letters of a described type on the bill of fare, or, if there should be no bill of fare, then to post on each side of the dining or eating room, in a conspicuous place, "Oleomargarine (or butterine or other substitute) used in place of butter." Defendant pleaded not guilty.

The facts were stipulated by the attorneys, subject to the right of either party to object to any part on the grounds of incompetency or irrelevancy. A considerable portion of the stipulation was stricken out by the court, subject to the objection and exception of the defendant. This appeal was taken from the judgment.

The stipulation of the parties was to the following effect: The oleomargarine which was sold had been manufactured by the defendant for the purpose of selling the same, and was at the time of such sale labeled in the manner provided by the laws of Minnesota, and was sold by the defendant to one Toy as and for oleomargarine or butterine, and not otherwise. The package was both labeled and sold strictly in accordance with the regulations of the internal revenue laws and regulations of the United States. The oleomargarine involved contained the following ingredients, in quantities and proportions specified: Oleo oil, neutral lard, cotton seed oil, milk, and salt. It contained no coloring matter of any sort, other than that naturally contained in these ingredients. It was a healthful and wholesome article of food. All the ingredients contained therein were healthful and wholesome, and were ingredients recognized as commonly used and essential in the manufacture of oleomargarine. The said ingredients were combined in the said product in the manner and in the proportions usual and necessary in the manufacture of oleomargarine. It is possible to manufacture oleomargarine so that it will not resemble butter having a deeper yellow color than that produced in winter and not artificially colored; but in order to do so it would be necessary to select the fats of stall-fed or dry-fed cattle in manufacturing the oleo oils for such oleomargarine and to discard all other fats. It would be impossible, even by selecting the fats as hereinabove stated, to manufacture oleomargarine so as not to resemble some butter made in the winter months and not artificially colored. Defendant had no intention of deceiving the purchaser or the public in the manufacture and sale of oleomargarine. Such article was manufactured and sold as oleomargarine, and as a substitute for butter. At that time butter was on sale for ten cents per pound more than oleomargarine; factors determining the market price of each being affected by the same causes.

The essential question involved in this appeal is the construction to be placed upon the first sentence of section 1753: "The manufacture or sale of oleomargarine * * * which is made or colored to imitate yellow butter is prohibited." The state contends that if it appears from the evidence that the defendants, in the ordinary course of business, took certain materials, all of them wholesome, and combined them in such a way as to produce a product which in taste, texture, smell, color, and general appearance, resembled yellow butter, the defendant "made" a substance which resembled yellow butter, and is within the purview of the statute, and that, as it appears from the evidence in this case the defendant selected in the making of the oleomargarine in question such materials as would give the product a deep yellow color, defendant "wilfully and intentionally" made a product which resembled yellow butter.

This construction appears to us to be forced and unreasonable, and to endanger the constitutionality of the law. The obvious purpose of the law as a whole is to prevent the manufacture and sale of something which was intentionally made to imitate yellow butter, so as to defraud and deceive, and not to prohibit the exercise of the right of manufacturing and selling a wholesome article of food. This purpose is evident from the juxtaposition of section 1753 with sections 1754 and 1755, which are designed solely to protect the consumer against fraud. These sections not only require that the package must be labeled, but also that bills of fare and placards must indicate its use.

The right to manufacture and sell oleomargarine includes the right to sell such an article as that upon which this prosecution was based. The color of the product was a necessary and natural incident of the use of proper and recognized and necessary ingredients. It was not the result of attempted imitation. Within the usual and accepted meaning of the term "oleomargarine," the elimination of any one of the ingredients here used would have prevented the product from being oleomargarine at all. Of such ingredients three—namely, neutral lard, milk, and salt—could not impart any color to the compound, unless we regard white as a color. The remaining two ingredients form the fundamental basis for the substance. Oleo oil is the most substantial element involved. Unless the manufacturer is to be compelled to select only the fats of dry-fed cattle, and shut down his

plant during the seasons of the year when such cattle do not come into market in sufficient quantities, the oleo oil used at certain times is bound to have a yellowish color, and therefore to impart some color to the product. The other substantial element consists of either butter or cotton seed oil. The evidence is that one or the other must be used. If butter is employed, we are compelled to take notice that no butter is pure white, and that all butter varies in color from a light yellow in the winter months to a more or less deep shade of yellow in the summer time, even though no artificial coloring matter is used. Cotton seed oil is frequently used in this connection as a substitute for butter, because it is cheaper and serves the same purpose. It was so used in the formula from which the sample before us was prepared. The stipulation expressly recites that the substitution of cotton seed oil for butter had no effect so far as color was concerned.

This construction is further necessitated by the fact that, in order to sustain this, a criminal prosecution, there must have been evidence of intent that the oleomargarine was made or colored to imitate yellow butter. No such intent was shown, nor was there any evidence shown from which that intention might be inferred. This is, therefore, not a case in which the effect of the evidence is for the trial court, whose conclusion will not be disturbed upon appeal.

It is to be noted, moreover, that the law prescribes no standard for determining what is yellow butter. Entirely natural butter is of many shades of yellow. If the trade fixes the criterion, then the law is open to the objection that it puts it into the power of private persons to create and define an offense. That power belongs to the legislative branch alone, and cannot be delegated. Cf. State v. Emery, 55 Oh. St. 364, 45 N. E. 319.

As here construed the statute is not unconstitutional, under either the state or federal constitutions, as an absolute prohibition of "an important branch of industry, not injurious to the community, and not fraudulently conducted, solely for the reason that it competes with another, and may reduce the price of an article of food." See People v. Marx, 99 N. Y. 377, 2 N. E. 29, 52 Am. 34; People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. 465; Colon v. Lisk, 153 N. Y. 188, 47 N. E. 302, 60 Am. St. 609; People v. Hawkins, 157 N. Y. 1, 51 N. E. 257, 42 L. R. A. 490, 68 Am. St. 736; People v. Biesecker,

105 M.—24

169 N. Y. 53, 61 N. E. 990, 57 L. R. A. 178, 88 Am. St. 534; Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832; Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937; Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; 1 Tiedeman, State and Federal Control of Persons and Property, pp. 517, 254, 510; 2 Id. p. 1045; Freund, Police Power, p. 56.

Not only principle, as has appeared, but the overwhelming weight of authority is with the defendant. An essentially similar question was presented in Massachusetts. The statute there read in part: "Whoever * * * sells * * * an article * * * made wholly or partly out of any fat, oil, or oleaginous substance or compound thereof, not produced from unadulterated milk or cream * * * shall be punished," etc. In Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223, this statute was construed. Mr. Justice Harlan, inter alia, said: "The statute seeks to suppress false pretenses and to promote fair dealing in the sale of an article of food. It compels the sale of oleomargarine for what it really is, by preventing its sale for what it is not. * * * [The statute] is aimed at all oleomargarine artificially colored so as to *cause* it to look like genuine butter and offered for sale in Massachusetts." [The word cause is in italics in the original.] This is a fair statement of the effect of the law under consideration.

That opinion refers to the rule in New York. There an absolute prohibition of the manufacture and sale of oleomargarine was held unconstitutional. People v. Marx, supra. A subsequent law, similar to the one at bar, was held constitutional, because "the producers of butter from animal fats or oils, although the product may be wholesome, nutritious and suitable for food, and so the manufacture and sale thereof may not be prohibited, have no constitutional right to resort to devices for the purpose of making their product resemble dairy butter, and the legislature has power to enact such laws as it may deem necessary to prevent the simulated article being put upon the market in such form or manner as to be calculated to deceive." People v. Arensberg, 105 N. Y. 123, 11 N. E. 277, 59 Am. 483, approved in Plumley v. Massachusetts, supra. The statutory prohibition

was construed to have been aimed at a designed and intentional imitation of dairy butter in manufacturing the new product, and not a resemblance in qualities inherent in the articles themselves and common to both. To sustain a conviction under a later form of the law it was held that there must be shown that the oleomargarine was made in imitation or semblance of natural butter. People v. Meyer, 44 App. Div. 1, 60 N. Y. Supp. 415.

So the New Jersey act has been held not to have been violated where only materials are used which are "employed chiefly to make up the substance of the compound, and which impart some color only as a necessary incident of their use." Ammon v. Newton, 50 N. J. L. 543, 14 Atl. 610. To the same effect, see Bennett v. Carr, 134 Mich. 243, 96 N. W. 26; McCann v. Com., 198 Pa. St. 509, 48 Atl. 470; Com. v. Mellet, 27 Pa. Super. Ct. 41; and Com. v. Vandyke, affirming Arnold, J., 13 Pa. Super. Ct. 484. See also Schollenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49. Meyer v. State, 134 Wis. 156, 114 N. W. 501, is substantially in accord. It was there said: "The words, 'which shall be in imitation of,' used in describing the contraband compound, imply a conscious imitation in the manufacture thereof." As opposed to this array of authority is the single case of State v. Armour, 124 Iowa, 323, 100 N. W. 59, in which, however, a different, although similar, statute was construed.

It is accordingly ordered that the judgment in the court below be reversed.