STATE v. P. G. HANSON.[1]

June 21, 1901.

Nos. 12,666—(179).

### Sale of Cottolene—Lard Substitutes.

G. S. 1894, §§ 7028, 7037, relating to the sale of lard substitutes, construed. *Held*, that they forbid the sale of cottolene which is manufactured so as to resemble lard, unless the package containing it is labeled, "Lard Substitute."

[1] Reported in 86 N. W. 768.

**Conviction Sustained.**

Evidence in this case justified the conviction of the defendant of the offense of selling cottolene without its being so labeled.

Defendant was convicted in the municipal court of Minneapolis, Holt, J., of the offense set forth in the opinion, and from the judgment of conviction he appealed. Affirmed.

*Flannery & Cooke* and *Wendell Herliy*, for appellant, cited: People v. Arensberg, 105 N. Y. 123; Plumley v. Massachusetts, 155 U. S. 461, 475; People v. Meyer, 44 App. Div. (N. Y.) 1; Grosvenor v. Duffy, 121 Mich. 220; Schollenberger v. Pennsylvania, 171 U. S. 2, 18; Collins v. New Hampshire, 171 U. S. 30.

*Frank Healy* and *Edward F. Waite*, for the State, cited: McAllister v. State, 72 Md. 390; State v. Newton, 50 N. J. L. 549; Palmer v. State, 39 Oh. St. 236; Pierce v. State, 63 Md. 592; State v. Snow, 81 Iowa, 642; Stolz v. Thompson, 44 Minn. 271; People v. Marx, 99 N. Y. 377; State v. Horgan, 55 Minn. 183; Armour Packing Co. v. Snyder, 84 Fed. 136.

START, C. J.

The defendant was convicted in the municipal court of the city of Minneapolis of the offense of selling a can of cottolene, manufactured in imitation of lard, and designed to take its place, without labeling the package "Lard Substitute." He was sentenced to pay a fine of $25 and costs. He appealed from the judgment, and the important question for our decision is whether his conviction was justified by the evidence.

The statute upon which the conviction rests is G. S. 1894, §§ 7028, 7037. So far as here material, section 7028 is to the effect that every person who manufactures or sells any substance made in the semblance of lard, or as an imitation thereof, or a substitute therefor, designed to take the place of lard, shall cause the package containing it to be labeled "Lard Substitute." The original of this section is Laws 1891, c. 12, § 3, and it has never been directly amended; but section 12 of the same chapter, which originally declared any violation of the provisions of the act to

be a misdemeanor and fixed the penalty, was by Laws 1893, c. 126, amended by adding thereto substantially this:

"Provided, however, that the provisions of this act shall not apply to cottolene, a compound consisting of a mixture of beef stearine and refined cotton-seed oil, where the  *  *  *  package *  *  *  shall be  *  *  *  labeled  *  *  *  with the word 'cotto-lene,'  *  *  *  and provided further, that said cottolene shall not be manufactured in imitation of lard, and shall not contain any substance deleterious to health."

Section 12, as so amended, is now section 7037.

It is to be observed that the offense is defined by section 7028, and the gist of it is the selling of any substance made in the semblance of lard, or in imitation thereof, or a substitute there-for, designed to take the place of lard, unless the package containing it is labeled as required, while the proviso of section 7037 excepts from the operation of section 7028 cottolene, consisting of the mixture therein designated, if labeled as such, and if it is not manufactured in imitation of lard, and does not contain any substance deleterious to health. This proviso, then, must be construed as an exception to the statute creating the offense, and as imposing the burden upon a defendant charged with the offense, and shown to have sold any substance made in the semblance of lard, or as an imitation thereof, or a substitute there-for, designed to take the place of lard, without the label, of proving that the article sold was within the exception. State v. Corcoran, 70 Minn. 12, 72 N. W. 732. No testimony was offered on behalf of the defendant, but it is here claimed that the state affirmatively proved that the article sold was within the exception, and that the proviso to section 7037 was fully complied with by the defendant in making the sale. If this be so, it follows that the evidence is not sufficient to sustain the conviction. The evidence, however, was practically conclusive that the article sold was intended as a substitute for lard, and that it resembled in its appearance commercial lard; that is, lard made exclusively from the fat of the hog, and prepared and sold by the large packing houses of the country. But the defendant insists that such resemblance was a natural one, and has no tendency to establish

the fact that it was manufactured in imitation of lard, within the meaning of the statute. That is, it is claimed that the selling of cottolene, which is designed to take the place of lard, without labeling it "Lard Substitute," is not within the statute, although it resembles lard made exclusively from the fat of the hog, unless such resemblance is artificially and intentionally created in manufacturing it. This limitation of the meaning of the words of the statute, "manufactured in imitation of lard," is too narrow. The meaning of these words is to be ascertained by reading them in connection with the provisions of section 7028, which were construed and held constitutional in the case of State v. Aslesen, 50 Minn. 5, 52 N. W. 220, in which the court said:

"It is evident from its language that its provisions are not confined to articles 'made in the semblance of lard, or as imitation of lard,' or which so resemble lard that they are liable to be sold and passed off on the public as lard, and which, for the sake of brevity, we may call 'simulated articles.' The act applies as well to any substance made as a 'substitute for lard, and which is designed to take the place of lard,' and which consists of any mixture or compound of animal or vegetable oils or fats, other than hog fat, in the form of lard, whether such substance resembles lard in appearance or not."

On the trial of the case cited, the defendant offered to show not only that cottolene was wholesome, but that it did not resemble lard in appearance.

At the next session of the legislature after the filing of the decision in that case the proviso in question was enacted, whereby cottolene, labeled as such, was excepted from the provisions of the statute, if not manufactured in imitation of lard. The statute before its amendment required the label "Lard Substitute" on all articles offered for sale which were made in the semblance of lard, or as an imitation thereof, and also upon any substance designed to take the place of lard, whether it resemble lard or not. Now, it is manifest that the intention of the amendment was to permit any substance designed to take the place of lard, which does not resemble lard, to be sold under its own label, because such a substance cannot be passed off upon the public

as lard. It is equally clear that it was not the purpose of the amendment to permit the sale, without the prescribed label, of any article made in the semblance of lard, or as an imitation thereof, so that it would be liable to be put off as lard. To give the amendment any other construction would defeat the very purpose of the statute. It follows that the words of the amendment, "manufactured in imitation of lard," are to be given the same effect as the words, "semblance of lard or as an imitation of lard," in the original section. We therefore hold that sections 7028 and 7037 forbid the sale of cottolene which is manufactured so as to resemble lard, unless the package containing it is labeled "Lard Substitute," although such resemblance is a necessary result of its manufacture,—an improbable hypothesis.

This construction of the statute does not render it unconstitutional, for it does not prohibit the sale of cottolene, but simply requires that when it is designed to take the place of lard, and so resembles lard that it is liable to be passed off upon the public for lard, the package containing it must be marked, "Lard Substitute." Or, in other words, the statute, as we have construed it, does not attempt to prohibit the sale of cottolene. It may be manufactured and sold, but if it is designed to take the place of lard, and is manufactured in imitation of lard, it is not within the provisions of the act of 1893, excepting it from the operation of the act of 1891. In such a case the provisions of the latter act only apply, and it must be labeled "Lard Substitute." On the other hand, if it is not so manufactured, it is within the exception, and the provisions of the act of 1891 do not apply, and it may be sold without such label.

There is no hardship in this requirement that cottolene manufactured so as to resemble lard shall be labeled "Lard Substitute." If cottolene is just as wholesome, just as good, and cheaper than lard, let it compete with the hog product on fair terms, under a label declaring the truth,—that it is a substitute for lard, not lard, as it appears to be. It probably is true in this particular case that the package containing the cottolene was so marked that no intelligent purchaser could be deceived into believing that he was buying lard. But it is the province of the legislature to

determine what precautions must be observed to prevent deception in the sale of food products, and courts have no power to substitute something else which they may deem to be equally as efficacious. It is only when the specific means prescribed by the legislature to prevent such deception are arbitrary or prohibitive that the courts can interfere. We hold, upon the whole record, that the evidence is sufficient to justify the conviction of the defendant of the offense of selling a substance manufactured in imitation of lard, and designed to take the place of it, without the prescribed label, within the meaning of the statute as we here construe it, and, further, that the evidence received for that purpose was competent and material.

Judgment affirmed.

BROWN, J. (dissenting).

Statutes of the character of the one under consideration in this case are constitutional and valid only when enacted in the interests of the public welfare. A statute prohibiting the manufacture or sale of a wholesome article of food could not be upheld for a moment, but the manufacture or sale of unwholesome food products may be prohibited, and statutes enacted for that purpose are sustained by all the courts. But no case can be found sustaining an absolute prohibition of the manufacture or sale of wholesome articles. Such statutes are within the authority of the lawmaking power when their object or purpose is to preserve the public health, or to prevent fraud and deception by the sale of articles manufactured in imitation of other commodities. To preserve the public health and to prevent fraud and deception of this kind, it is perfectly legitimate and proper for the legislature to prohibit the sale of unwholesome articles of food, and to require that all imitations and substitutes be placed on the market and sold under their true names. Oleomargarine statutes are illustrations on this subject. That article or commodity was manufactured not only as a substitute for butter, but in imitation thereof, and for the purpose and with the intent of placing it on the market to be sold as butter. To prevent fraud and deception, and in the interests of the public

good, laws were enacted whose object and aim was to compel oleomargarine to stand or fall on its own merits. No complaint can be made of such statutes, nor of the decisions upholding them. They come clearly within the police power of the government, and are necessary to the proper protection of the public.

The statute under which defendant in the case at bar was prosecuted in G. S. 1894, §§ 7028, 7037. The statute was enacted in 1891, and provides generally that no person shall, within this state, manufacture for sale, or have in his possession with the intent to sell or expose for sale, as lard, any substance not the legitimate product of the fat of the hog, unless such article or substitute be plainly marked "Lard Substitute." Penalties are provided for a violation of the statute. Subsequent to the passage of this act the case of State v. Aslesen, 50 Minn. 5, 52 N. W. 220, arose, and was there construed and interpreted. The defendant was charged in that case with violating the statute by selling an article for lard without having it marked and labeled as required by the act, and he interposed in defense that the article sold by him was cottolene. He offered to prove that cottolene was a wholesome article of food, but was not permitted to do so, and his conviction was sustained because of the fact that the article was not properly labeled as required by statute. In 1893 the legislature, acting evidently on the theory that cottolene was a wholesome article of food, and was proper to be manufactured and sold under its own title and upon its own merits, amended the act of 1891 by adding thereto the following proviso:

"Provided, however, that the provisions of this act shall not apply to cottolene, a compound consisting of a mixture of beef stearine and refined cotton-seed oil, where the tierce, barrel, tub, pail or package containing the same shall be distinctly and legibly branded or labeled in letters not less than one-half inch in length, with the word 'Cottolene' and the name and location of the person or firm manufacturing the same, and provided further that said cottolene shall not be manufactured in imitation of lard and shall not contain any substance deleterious to health."

By this amendment cottolene was expressly taken from the operation of the prior act, and explicitly recognized as not being a substitute for lard, but a proper and wholesome article of food.

So that, under the law as it stands to-day, cottolene may be sold. if distinctly labeled "Cottolene" on the pail or the package in which it is contained. And the only provision of the statute which can have any bearing upon the case is the second provision contained in the act of 1893, as follows:

"Provided further, that said cottolene shall not be manufactured in imitation of lard, and shall not contain any substance deleterious to health."

And the only proper and legitimate inquiry is whether the pail of cottolene sold to complainant was manufactured and sold in imitation of lard. That it was not seems to me beyond controversy. The package in which it was contained was plainly marked "Cottolene," as required by the statutes, was sold to complainant as cottolene, and there is no pretense of a claim that he was deceived or defrauded in any way. He asked for cottolene, and was given that article, not as a substitute or an imitation of lard, but for what it purported to be, and what he asked for and desired to purchase. The burden of proof was upon the state to establish a violation of the law by evidence beyond a reasonable doubt. In this the state wholly failed. It was incumbent upon the prosecution to show and prove that the cottolene sold to complainant was manufactured in imitation of lard,—not that it had the semblance of lard in appearance or color, but that it was in fact purposely and intentionally manufactured as an imitation.

Clearly, under this statute, in order to show that an article is made in imitation of another, it is necessary to prove an intention and purpose on the part of the manufacturer to do so. If a combination of the natural ingredients of cottolene, namely, beef stearine and refined cotton-seed oil, resembles lard in color, it by no means follows that it was manufactured in imitation of that article. It appeared in this case from the evidence introduced by the state itself that the cottolene in question contained nothing but the ingredients specified in the act of 1893. The purpose and intent necessary to be shown by the prosecution for the violation of a statute like the one here under consideration are very clearly discussed in the case of People v. Meyer, 44 App. Div. (N. Y.) 1,

84 M.—4

60 N. Y. Supp. 415. The case is one involving the statute on the subject of oleomargarine, and is directly in point. The court there said:

"The defect in the plaintiff's proof was the omission to show that the appearance of oleomargarine in its natural condition differed from that of the substance which the defendant sold as butter; or, in other words, that the oleomargarine had been changed in some manner so as to make it look like butter. It is settled that the legislature cannot constitutionally prohibit the sale of oleomargarine, except so far as the product is made to simulate some other substance and thereby deceive the people. * * * In order, therefore, that the express prohibition against the manufacture and sale of oleomargarine now contained in section 26 of the agricultural law * * * shall be deemed constitutional, it is essential to construe that prohibition with the remainder of the section, as forbidding only the manufacture and sale of oleomargarine when it is manufactured in imitation or semblance of natural butter. Adopting this construction, there was, as has already been said, a failure of proof on the part of the plaintiffs, in omitting to give evidence of the imitative character of the substance sold by the defendant. It is impossible to say that the appearance of the oleomargarine had been altered so as to make it resemble natural butter, unless we know in the first instance what oleomargarine looks like in its normal condition. There is no testimony in the record on this subject, and it is not a matter of which the courts can take judicial cognizance."

The opinion of the majority in the case at bar, it seems to me, goes far beyond the necessities of the occasion, and is evidence of much labor and ingenuity to sustain this prosecution. They expressly hold that the statutes forbid the sale of cottolene unless the package which contains it is labeled "Lard Substitute," although its resemblance to lard is an incidental result of its manufacture. The decision is palpably in the teeth of the statute, and a construction thereof which renders it unconstitutional and void. It is in the teeth of the statute because the amendment of 1893 expressly provides that the provisions of the prior act—that

of 1891—shall not apply to cottolene. Notwithstanding this express declaration of the legislature, the majority apply the former statute to the same extent and with the same force and effect as though the act of 1893 had not been passed. The construction given the statute by the majority renders it unconstitutional and void, because it interprets the same as prohibiting the sale of a wholesome article of food. It is conceded that cottolene is wholesome, and the books will be searched in vain for a case upholding legislation prohibiting the sale of such an article simply because it resembles some other article.

For these reasons, I dissent.

LEWIS, J. (dissenting).

I concur with Justice BROWN. The reasoning of the majority opinion is based upon purely technical grounds, and I feel it my duty to register a protest. Laws 1891, c. 12, contains a plain and direct prohibition against the selling as lard, and as a substitute for lard, or as an imitation of lard, any compound designed to take the place of lard, unless the same shall be provided with a label containing the words "Lard Substitute," and stating the ingredients and the name of the manufacturer. In the Aslesen case the defendant sold cottolene without labeling it, and it was held that cottolene was a lard substitute, and, if sold, must be labeled as provided by the act. The decision rests upon the theory that this compound was designed to take the place of an old and well-known article, and, such products being comparatively new on the market, their qualities and ingredients are not usually a matter of common knowledge. As stated in the opinion in that case:

"Many of them, like cottolene, may be entirely wholesome, but, in this day of the common adulteration of articles of food, others may be composed of deleterious ingredients. And what may be wholesome for one person may be unwholesome for another. Moreover, it is also a matter of common knowledge that, whether well founded or not, there is a popular prejudice against certain ingredients in an article of food. This is so, for example, with cotton-seed oil. Many would not purchase or use a lard substitute

of which that oil was an ingredient, or any article of food prepared with it. In view of all these facts, the legislature has seen fit to require the seller of these lard substitutes to label the article which he sells with what, for convenience, we may call a quantitative analysis of its ingredients, and to require the seller of any article of food prepared with such lard substitute to give notice of the fact to the purchaser, so that he may know just what he is buying. This certainly does not deprive the seller of his property without due process of law. No man has a constitutional right to keep secret the composition of substances which he sells to the public as articles of food."

Upon this theory, it was immaterial whether the compound, cottolene, was wholesome or not, which was the exact point for review in that case.

At the very next session the legislature proceeded to remove the effect of that decision by enacting the proviso of Laws 1893, c. 126. In the referred-to decision the court had declared that, even if cottolene was a wholesome preparation, it must be labeled "Lard Substitute"; but the legislature, recognizing the wholesomeness of the article and the public demand for it, amended the act of 1891 by providing that it should not apply where cottolene consisted of a mixture of beef stearine and refined cotton-seed oil, and was labeled "Cottolene," containing the name and location of the manufacturer.

In other words, by the amendment the legislature enabled manufacturers of cottolene to place the product on the market upon its own merits. As a precaution against fraud, and to further protect the public against injurious compounds in the form of cottolene, the second proviso was added, which simply means this: That in the manufacture of cottolene nothing shall be added to the ingredients of its composition (beef stearine and refined cotton-seed oil) which will cause it to be an imitation of lard. If, through the manufacturing process of the ingredients recognized by the statute, cottolene comes out to resemble lard, that fact is immaterial, so long as no foreign substance, deleterious to health, is introduced in its composition. It is well known that lard varies in color, running from a grayish tint to a pure white, according

to the care taken in its making; and in like manner cottolene may vary in color. Under the evidence in this case before us, it was conclusively shown that the product was a compound of pure beef stearine and refined cotton-seed oil, although it resembled commercial lard.

The reasoning of the main opinion leads to the most absurd results. As if, with the label "Cottolene," in large type, encircling the can, a purchaser might be deceived and his innocence imposed upon because, on opening the can, he found its contents resembling commercial lard,—a clearer white than might be produced by the natural mixing of the ingredients. With equal reason it may be argued that deceit has been practiced, and some concoction imposed on innocence, when lard, in its process of making, does not come out a clear white, as is frequently the case, though made of pure hog fat. As the court has construed the law, it would seem to offer a premium on adulteration, to make the article sell upon its merits as cottolene.