# STATE v. OLE HANSON.[1]

May 31, 1912.

Nos. 17,717—(12).

**Oleomargarine — act of 1911 unconstitutional.**

Defendant was convicted of selling oleomargarine made in imitation of butter of a shade or tint of yellow, under chapter 183, Laws of 1911. It is *held*:

1. Evidence was sufficient to justify the jury in finding that the oleomargarine sold was by intentional selection of ingredients, though without artificial coloring, purposely made of a shade or tint of yellow.

2. Chapter 183, Laws 1911, construed, and *held* to prohibit the manufacture or sale of oleomargarine purposely made of a shade or tint of yellow, though no artificial coloring matter is used, and that the words "butter of a shade or tint of yellow" mean not only "yellow butter," but all butter which has any shade or tint of yellow.

3. As so construed, section 1 of the act is unconstitutional, in so far as it prohibits the manufacture or sale of oleomargarine of a shade or tint of yellow; such shade or tint being produced by natural and essential ingredients which are not deleterious or injurious to health.

Defendant was indicted by the grand jury of Blue Earth county, charged with the crime of selling oleomargarine manufactured in imitation of butter of a shade or tint of yellow, contrary to the provisions of the statute in such case made and provided. The defendant pleaded not guilty, and was thereafter tried in the district court for that county before Pfau, J., and a jury which convicted him of the offense charged in the indictment. From an order denying defendant's motion for a new trial, he appealed. Reversed and new trial granted.

*Frank B. Kellogg, C. A. Severance, Robert E. Olds* and *Henry Veeder,* for appellant.

[1] Reported in 136 N. W. 412.

[Note] Applicability of oleomargarine statutes where resemblance to butter results from choice of ingredients, and not from introduction of foreign matter, see note in 14 L.R.A.(N.S.) 1061.

*Lyndon A. Smith,* Attorney General, *Alexander L. Janes,* Assistant Attorney General, and *John W. Schmitt,* County Attorney, for respondent.

BUNN, J.

Defendant was convicted of selling oleomargarine made in imitation of butter of a shade or tint of yellow, in violation of the provisions of chapter 183, p. 226, Laws of 1911. He appealed from an order denying his motion for a new trial.

The questions here are (1) as to the sufficiency of the evidence to sustain a decision that there was an intent to make oleomargarine of a shade or tint of yellow, (2) as to the proper construction of the law, and (3) as to its constitutionality when so construed. The material provisions of the law in question are as follows:

The title is: "An act to regulate the manufacture and sale of oleomargarine and to prescribe penalties and punishments for violation of the provisions of this act."

Section 1 provides, in substance, that no person, firm, or corporation shall manufacture or sell oleomargarine which shall be in imitation of butter of any shade or tint of yellow, unless such oleomargarine shall be made and kept free from all coloration or ingredients causing it to look like butter of any shade or tint of yellow, nor unless the same shall be kept and presented in a separate and distinct form, and in such manner as will advise the purchaser and consumer of its real character.

Section 2 makes it unlawful to sell or offer for sale oleomargarine which is not conspicuously labeled as such on each tub, package, or parcel thereof, and requires the wrapping in which it is sold to purchasers to be plainly stamped with the word "oleomargarine." Descriptive matter on the label is required to be free from misleading information, or any matter that would indicate that the product was butter. At the end of this section is this proviso: "Provided, that nothing in this section shall be construed to prohibit the manufacture or sale of oleomargarine in a separate and distinct form and in such manner as will advise the purchaser and consumer of its real char-

acter, when free from coloration or ingredients that cause it to look like or resemble butter of any shade or tint of yellow."

Section 3 makes it unlawful for the proprietor of any hotel, dining room, café, bakery, boat, lumber, mining, or railroad camp, boarding house, or hospital, where guests, boarders or patients are served with food, to serve oleomargarine as or for butter, or as a substitute for butter, unless the bill of fare, if there be one, or a placard conspicuously posted, if there be no bill of fare, shall announce "Oleomargarine used in place of butter."

There is no claim by the state that the oleomargarine sold by defendant was artificially colored by the addition of any dye or coloring matter. The sole charge is that the essential ingredients were so selected and mixed as to produce an article that resembled or imitated butter of a shade or tint of yellow. It is not denied that the article sold possessed this shade or tint of yellow, and in that respect, as well as others, resembled butter. That the maker intended to produce this result, and deliberately endeavored to make an article that would look like butter of a yellow shade or tint, is, we think, established by the evidence. But it is freely admitted that this color is the result of judicious selection and combination of fats, oils, and other necessary ingredients; that no coloring matter is used; and that the result is a thoroughly healthful product that resembles yellow butter in appearance and texture, tastes like butter, and sells at a lower price. That it was possible for the manufacturer, the real defendant here, to make oleomargarine that was equally wholesome and palatable, but of a shade or tint of yellow that was much lighter than the article on the sale of which the conviction was based, is clear, because oleomargarine of such lighter shade or tint was also manufactured and sold. But it is fully established and conceded that it is impossible to make oleomargarine that is pure white, or that does not have a slight yellow shade or tint. And such light-tinted article does imitate or resemble light-tinted butter in the same sense and to the same extent that the deeper-tinted article imitates or resembles butter of a deeper yellow. In short, the manufacturer can produce oleomargarine of several shades or tints of yellow, all of which imitate butter of like shades or tints. The article that

defendant was convicted of selling was intentionally made of a deeper yellow. The motive is plain; the consumer will not buy the lighter colored article. The sales of this are but ten per cent of the sales of the yellow article, while the price is the same. There can be, however, no intent to deceive the purchaser or consumer, as the provisions of the law concerning labels on packages and wrappers are fully complied with. It is utterly impossible for the purchaser to be deceived.

1. The first of the questions involved on this appeal we answer in the affirmative. That is, as we have above pointed out, the evidence was sufficient to justify the jury in finding that the oleomargarine in question was purposely made of a shade or tint of yellow.

2. We are asked to construe the law as only prohibiting the use of artificial coloring matter, and not the coloration that comes from the ingredients themselves, selected with reference to producing a yellow color. It is insisted by defendant that this was the construction given to the 1905 law [1] in State v. Hammond Packing Co. 105 Minn. 359, 117 N. W. 606, and that the present law is not to be distinguished from the 1905 law. While it seems clear that on the question of an intention to produce oleomargarine of a yellow color by selection of the natural ingredients, the evidence in the Hammond case was sufficient for the same reasons that the evidence in this case is sufficient to show such intention, yet the opinion itself does not state that intentional coloration by artificial means was essential to a conviction. The decision apparently holds merely that there was no evidence of an intent to imitate yellow butter; but the stipulated facts in the case, the reasoning of the opinion, and the authorities relied on give ground for defendant's confident claim that it was held that the 1905 law prohibited only coloration by artificial means.

But whether this be correct or not, we think the present law cannot be so construed. Language in the 1905 law which gave color to the construction contended for was changed in the present law, probably to prevent this construction. The words "made or colored to imitate yellow butter" were changed to "shall be in imitation of butter of any shade or tint of yellow." Where the 1905 law permits the sale of oleomargarine, "if not in semblance of yellow butter, and if

[1] [R. L. 1905, §§ 1753–1756.]

free from prohibited ingredients," the present law forbids its sale *"with or without coloring matter* unless  \*   \*   \*   made and kept free from all coloration or *ingredients* causing it to look like butter of any shade or tint of yellow." We would be willing to adopt any construction to which the language used is fairly susceptible, in order to uphold the law; but we feel that the intent of the legislature is clearly manifest that oleomargarine shall be kept out of the field of yellow of the various shades and tints now occupied by butter, and this whether the yellow shade is produced by extraneous coloring matter or by intentional selection of the natural ingredients.

We cannot, however, agree with the state's contention that "butter of any shade or tint of yellow" means simply "of the color of yellow butter." The words "any shade or tint of yellow" are used three times in the law; and it was so clearly the intention to make a distinction between "yellow butter" and butter of a "shade or tint of yellow" that we are unable to say that the words are to be given no meaning. The state advances the ingenious argument that the law was intended to prohibit only oleomargarine that was in imitation of butter of those shades of yellow usually found in yellow butter, and not to forbid its manufacture so as to resemble butter of the shades of yellow more closely approaching the white. This is a difficult position to sustain. Butter varies in color from the golden color of June butter to the light-colored butter of winter, and to the nearly white butter often sold. There is nearly, if not quite, as much difference in the shades or tints of yellow found in butter as there is in the shades and tints of the various samples of oleomargarine received as exhibits in this case. In other words, the light-colored oleomargarine made by Swift & Company, the manufacturers, resembles butter of a light shade or tint of yellow, while the darker product resembles butter of a dark shade or tint of yellow. We are not unmindful that the intention of the legislature to prohibit, under the guise of regulation, should not be presumed, or of the fact that the lawmakers must have known that it was impossible to make a pure white oleomargarine. They undoubtedly knew this, and also that butter is of all shades of yellow. But to say that they intended to prohibit the sale of oleomargarine which should resemble or imitate June butter, or butter

of a deep yellow color, or of any particular shade of yellow, is to disregard entirely the words "of any shade or tint."

We construe the law, therefore, as making criminal the sale or manufacture of oleomargarine purposely made of *any* shade or tint of yellow, whether the tint or shade be dark yellow, golden, or light yellow. Even as so construed, section 1 of the law might be sustained as a valid exercise of the police power, if it made proof of an intent to deceive or defraud the purchaser or consumer, essential to a conviction. And it would be immaterial that no artificial coloring was used, or that the product was entirely wholesome, was exactly like butter in taste, or was in fact butter. The purchaser is entitled to know what he is buying; and any law enacted to prevent fraud or deceit, and having any fair tendency in that direction, would be valid.

But this law does not make the intent to deceive or defraud essential to a conviction of a violation of section 1. Intentionally making oleomargarine of a shade or tint of yellow is made criminal, without proof of an intent to deceive. This being so, the law cannot be sustained, unless there is a reasonable probability that the purchaser or consumer will be deceived by the yellow shade or tint into buying or eating oleomargarine, mistaking it for butter. Oleomargarine should be sold for what it really is. Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. ed. 223. The power of the legislature to regulate its manufacture and sale rests, not upon the right to legislate in the interest of the public health, but upon the undoubted right to enact laws to protect the public against fraud and deception, to suppress false pretenses and promote fair dealing in an article of food. But we are quite unable to perceive how there is any but a remote possibility of deceiving the purchaser or consumer by making oleomargarine imitate butter in color, whether it be a conscious or accidental imitation. The intent to make oleomargarine of a shade or tint of yellow by the selection of ingredients is no evidence of an intent to deceive either purchaser or consumer. Oleomargarine is made to resemble butter of a yellow color, not to deceive anybody, but because the public buys the substitute if it has the yellow shade, but refuses to buy it if it has a light shade.

The intent is not to deceive the public, but to make an article which will find a market.

It seems clear, not only that there was no intent to defraud or deceive, but that the color of the product has, in view of the stringent provisions of the law that clearly tend to prevent deception, no fair tendency to make either purchaser or consumer mistake oleomargarine for butter. The provisions of the law relating to placards upon the tubs or packages in which it is exposed for sale or sold, to the wrappers, stamped with the word "oleomargarine," in which the retail dealer is required to deliver it to the purchaser, the provisions forbidding misleading statements on labels, and those requiring the proprietors of hotels, restaurants, boarding houses, and other eating places to print on their bills of fare, or upon large placards, that oleomargarine is used in place of butter, are well designed to protect both the purchaser and the consumer from buying or spreading on his bread the butter substitute, if he does not wish to do so. It adds nothing to this protection of the purchaser or consumer to have the article colored white, red, or blue. It may be suggested that the guests of a private housekeeper have not this protection, or that store, hotel, or restaurant proprietors may not obey the law as to placards, or that a purchaser who cannot read may be deceived. But, granting that there may be a few instances where, by mistake, the consumer may take into his system oleomargarine, when he thinks he is eating butter, does this furnish a ground upon which the legislature can prohibit the manufacture and sale of a perfectly wholesome and healthful article of food? On the record before us, such a deception would be wholly without damage. In its last analysis, it is a mere matter of sentiment.

Let us look for a moment on the other side. The high price of butter is notorious. The poor man must often go without, or buy the inferior grades, while people of moderate means find good butter a luxury they can ill afford. There is a large and growing demand for a butter substitute that will taste and look like butter, and that can be purchased at a less price. Apparently, judging from the fact that sales of the light-colored oleomargarine are but ten per cent of the sales of the darker yellow, the people want their butter substitute

to resemble butter in color, as well as in texture and taste. The legislature says to them by this act: "You cannot have what you want; you must either buy butter made from cream, or you must buy oleomargarine that is white." Unless the prejudice of the people against the white color is removed, this is a command that they buy butter, and pay higher prices. It is impossible to appreciate why the public should not have a free choice, why butter should not be sold on its merits to those who want it, and why those who want oleomargarine of a yellow shade should not be permitted to have it. A law that tends to secure this result, and to enable the public to buy whichever article it wants, without danger of being deceived as to what it buys, is commendable. But a law that destroys competition between two products of equal merit, that precludes the public from purchasing what it wants, is surely meretricious, unless there is some question of public health or some danger of fraud or deception that makes such a law beneficial. Clearly no question of public health is involved; and there seems no danger of deception that at all compares with the advantages that come to the people by having their choice between the more expensive butter and the cheaper substitute.

Butter from cream may be made and sold in any shade or tint of yellow. Butter is given a monopoly of the entire yellow field, and oleomargarine must keep out. The inevitable results will be maintaining or increasing the price of butter, and striking down a great industry. All this under the power that the legislature has to pass laws that make for the public health, promote the public welfare, or prevent fraud and deceit in the sale of food products. But there are limits to the exercise of the police power. Where the legislature destroys private property or private rights under the guise of promoting the public health or preventing deception, there must be some basis for the decision that the public health will be benefited, or deception prevented. This is a question upon which the decision of the legislature is final, except where it is clear that no basis existed, when it becomes the right and duty of the court to interfere.

We are unable to escape the conclusion that the law in question not only seriously injures, instead of benefits, the public, but deprives the manufacturer of his property without due process of law, and

without a sufficient basis upon which the act can be upheld as a valid exercise of the police power. That this makes the law, in so far as it prohibits the manufacture or sale of oleomargarine made of a shade or tint of yellow, repugnant to both national and state Constitutions, is a conclusion that follows inevitably. The decision in the Hammond Packing Co. case directly recognizes this, and practically holds that the law involved in that case would be unconstitutional, if construed as we have felt obliged to construe the law involved here. It is in fact conceded that the legislature had no right to prohibit the manufacture of oleomargarine. It being a wholesome article of food, a statute prohibiting its manufacture or sale cannot be upheld. State v. Hammond Packing Co. supra; State v. Hanson, 84 Minn. 42, 86 N. W. 768, 54 L.R.A. 468.

Decisions, rendered when it was not established that oleomargarine contained no ingredients injurious to health, are clearly not in point. Butler v. Chambers, 36 Minn. 69, 30 N. W. 308, 1 Am. St. 638, was decided on the theory that it was a deleterious substance. The law of 1891,[1] requiring all oleomargarine to be colored bright pink, was sustained in State v. Horgan, 55 Minn. 183, 56 N. W. 688, upon the theory that laws prohibiting entirely the manufacture and sale of oleomargarine were valid, as had been held in Butler v. Chambers, supra, and in Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. ed. 253. But when it was proved that oleomargarine contained no substance injurious to health, it was held in Schollenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, 43 L. ed. 49, that it was a lawful article of interstate commerce, and in Collins v. New Hampshire, 171 U. S. 30, 18 Sup. Ct. 768, 43 L. ed. 60, that a state statute prohibiting the sale of oleomargarine as a substitute for butter, unless it was of a pink color, was invalid as being in necessary effect prohibitory. Since these decisions, there has been no case denying the right of oleomargarine to be classed as a wholesome food product, or upholding any prohibitory law.

The following language from the opinion of Justice Peckham, in the Collins case, is pertinent here. "To color the substance as provided for in the statute naturally excites a prejudice and strengthens a repugnance up to the point of a positive and absolute refusal to

---

[1] [Laws 1891, p. 83, c. 11.]

purchase the article at any price. The direct and necessary result of a statute must be taken into consideration when deciding as to its validity, even if that result is not, in so many words, either enacted or distinctly provided for. In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect. * * * Although, under the wording of this statute, the importer is permitted to sell oleomargarine freely and to any extent, provided he colors it pink, yet the permission to sell, when accompanied by the imposition of a condition which, if complied with, will effectually prevent any sale, amounts in law to a prohibition."

There can be no sound distinction between a statute requiring oleomargarine to be pink, blue, red, or black and one forbidding it to have the natural color given by its ingredients. In effect, this law says that oleomargarine must be white; for it is absurd to suppose that there would be any market whatever for a blue or pink product. But the evidence clearly shows, as we have before said, that the sales of the light-shaded oleomargarine are but ten per cent as against ninety per cent for the darker shade, and then the light-shaded article is not white, but has a "shade or tint of yellow." Considering that the direct and necessary result of the statute is to prohibit at least ninety per cent of the manufacture and sale of a wholesome article of food, it cannot save the law that it was enacted under the pretense of regulation. State v. Sperry & Hutchinson Co. 110 Minn. 378, 126 N. W. 120, 30 L.R.A.(N.S.) 966.

The statutes construed in Wisconsin and Iowa prohibit the manufacture and sale of oleomargarine made to imitate "yellow butter."

The court, in its opinion in the Wisconsin case, intimates strongly, if it does not distinctly hold, that, had the law prohibited oleomargarine in imitation of butter of any shade or tint of yellow, it could not be sustained. One of the grounds for reversing the conviction in that case was the instruction of the trial court that "yellow butter" meant butter of any shade of yellow. Justice Timlin says, in speaking of the instruction [page 162]: "It laid down a rule which, if followed by this court, would go far to convict the lawmakers of having, under pretense of making a police regulation to prevent fraud, enacted a law to exclude all competition of oleomargarine with all

kinds of butter." Meyer v. State, 134 Wis. 156, 114 N. W. 501, 14 L.R.A.(N.S.) 1061. The validity of the Wisconsin statute was not directly passed upon; the case involving its construction rather than its constitutionality.

The Iowa case (State v. Armour, 124 Iowa, 323, 100 N. W. 59, 2 An. Cas. 448) holds the statute of that state constitutional; but the force of the decision is weakened by the assumption that statutes absolutely prohibiting the sale of oleomargarine are constitutional, and by the fact that the law only prohibited oleomargarine made in semblance of yellow butter, and that no claim was made that it could not be manufactured without having "this yellow hue."

Our conclusion is that, if construed as we think it must be, section 1 of the law in question is invalid, because it amounts to a prohibition of the manufacture and sale of a wholesome article of food. This decision in no way affects the other provisions of the act, but is only that oleomargarine may be manufactured and sold, though it be of a shade or tint of yellow, providing such shade or tint is produced by natural and essential ingredients which are not deleterious, or injurious to health.

Order reversed, and new trial granted.

HOLT, J. (dissenting).

I do not profess to have greater reluctance to declare a law invalid than any of my Associates. But I cannot agree to the conclusion arrived at, and believe that the section of the law in question should be held valid, and so interpreted as to give effect to the intention of the legislature. Holding that view, it seems to me that the conviction was right.

The trial court instructed the jury: "If you find from all the evidence in this case, beyond a reasonable doubt, that state's Exhibit No. 1 [the butter sold] was made in imitation of butter of a shade and tint of yellow, and you further find from the evidence in the case that the said shade or tint of yellow was produced by an intentional combination and mixture of the ingredients thereof, made for the purpose of producing the said shade and tint of yellow, so that the same should be in imitation of butter of a shade or tint of yellow, and

the manufacturer thereof could have used and chosen the ingredients used in the manufacture of state's Exhibit No. 1, so that the same would not be in imitation of butter of any shade or tint of yellow, but intentionally and purposely so combined and mixed the said ingredients for the purpose of producing the same in imitation of butter of a shade or tint of yellow, then your verdict should be a verdict of guilty."

"Under the law, the manufacturer of the article would have no right to put together a combination of ingredients, in the manufacture of oleomargarine, for the purpose of imitating butter of a shade or tint of yellow, as provided under the law which I have charged you. But the manufacturer has a right to combine proper ingredients for the manufacture of oleomargarine for the purpose of producing the same, and producing thereby a wholesome and palatable food; and if in such production, and in such commingling of the constituents necessary thereto, the result is an article in the imitation of butter, as provided by the statute, of a shade or tint of yellow, it is not a violation of such law.

"I charge you, gentlemen, further, that there is no law in the state of Minnesota prohibiting the manufacture and sale of oleomargarine as such, and placing it upon the market as such. The law that is against it is, as I have read to you, that it shall not be made in imitation of butter or any shade or tint of yellow; and I charge you that it shall not be so purposely made in imitation of butter of a shade or tint of yellow."

It must then be assumed, upon this charge, that the jury found that the article sold by defendant was oleomargarine, designedly made by the collection of such ingredients, or the adoption of such process of extracting, preparing, or combining them as to imitate butter of a yellow shade or tint. The evidence amply sustains this finding of a wilful purpose to imitate the yellow color of butter in the manufacture of Exhibit 1.

It was admitted that Swift & Company was the manufacturer of this oleomargarine at South St. Paul, Minnesota. Three brands of its oleomargarine were received in evidence, the Premium, the Crown,

and the Lilly. Each brand consisted of two kinds, the white and the yellow. Exhibit 1 is the yellow Premium brand. These brands sell at different prices; the Premium being the highest priced. There is no difference in the price between the white and yellow kind of the same brands. The demand for white is only one-tenth of that for the yellow. The chief constituent of all appears to be oleo oil, extracted from the fat of beef. Of this, about fifty per cent is used in the white kind and five per cent more in the yellow, except in the yellow of the Premium brand. Another ingredient is cotton seed oil. Of this, fifteen to twenty per cent is used in the yellow and five to ten per cent in the white oleomargarine. In the yellow Premium, butter is used instead of the milk and cream used in the other kinds.

It also appeared that by using so-called June butter color might be added; also by selecting the fats from which the oleo oil is extracted, as well as by variation in temperature and pressure in extracting it. Bleached cotton seed oil may be obtained which is colorless, and, by varying the temperature in the manufacture of cotton seed oil, the yellow color may be controlled to a certain extent. The difference in the demand is a motive for the attempt to make the yellow the imitation of the ordinary butter color.

Originally oleomargarine was made with hardly any shade of yellow, unless coloring matter was added. Then Congress enacted a law placing a higher tax on oleomargarine, where artificial coloring matter was used. Thereupon the ingenuity of the manufacturer was directed to so select, make, and combine the necessary ingredients as to produce the desired butter color without the addition of any specific substance for the purpose of giving color alone. The effort was successful, and legislation against the use of colors to produce the ordinary butter yellow failed to protect the consumer against deception. Manifestly the act in question was directed against this newly discovered method of manufacture, whereby the desired yellow butter color was attained without the use of special coloring matter. The claim that it is more expensive to use milk and cream than butter to give the butter flavor falls, when it is observed that the June butter is used only in the highest priced yellow brand.

That the legislature has the right to regulate the sale of a food
118 M.—7.

product made in imitation of and as a substitute for a staple article of well-known origin and food value, so that the public may be protected from deception, is so well settled that authorities need not be cited. The right of the legislators to not only regulate, but prohibit, the sale of oleomargarine is held in Butler v. Chambers, 36 Minn. 69, 30 N. W. 308, 1 Am. St. 638, and the cases there cited. The title of the act (chapter 183, p. 227, Laws 1911) shows the purpose to be to regulate the manufacture and sale of oleomargarine, not to prohibit; and with that end in view the law must be interpreted. Therefore the narrow, literal construction that, if the product contains any tint or shade of yellow, its sale is prohibited must be rejected, because no oleomargarine has been made, or is being made, absolutely free from the tint of yellow. Courts ought not to accuse legislators of an attempt to prohibit by underhanded indirection, when they openly profess to regulate only. Therefore, to give meaning and effect to the manifest intention of the act, the phrase "imitation of butter of any shade or tint of yellow" must be construed as equivalent to "imitate yellow butter." In ordinary parlance, butter is called white or yellow. We speak of winter butter as white, and with "June butter" is understood an article of a pronounced yellow color. Although, strictly speaking, there is some yellow in the whitest winter butter, it is often designated as white. It should also be borne in mind that the manufacturers of oleomargarine make what is termed "white," as distinguished from the so-called "yellow," kind of the same brand. With knowledge that the efforts of the manufacturers to imitate the yellow butter in the product, without the addition of colors, but by manipulating the process and ingredients, had partially or, perhaps, wholly succeeded, the inference is not strained that the legislature intended to prohibit the sale of oleomargarine so manufactured that a yellow butter color was imparted to it from whatever cause.

The ordinary method of manufacture from the usual ingredients seems to produce the white oleomargarine, so-called. This product contains the same ingredients as the yellow, is as easy to make, and has the same taste and food value. Either dyes must be used or else the manufacturer must resort to intentional selection, manipula-

tion, and combination of the ingredients to produce the yellow kind. To construe the law to mean that the oleomargarine manufactured and sold must not imitate yellow butter, there is no prohibition, only regulation. It merely requires the manufacturer to abstain from taking pains to make the product imitate yellow butter, to the end that the consumer, when he eats a substance which looks like ordinary yellow butter, knows he is not eating oleomargarine.

The contention may be made that this discriminates against the so-called white butter and yellow oleomargarine, and the consumer of the product that is light or white has no notice of what he eats from that color. Grant this to be true, it is an argument that should appeal to the legislators, but ought to have little weight when addressed to a court, asking that a legislative act be declared of no effect or meaning. It may be urged that the purity, wholesomeness, and nutritive value of oleomargarine is not surpassed by butter; and hence the mere sentiment of the consumer ought not to be considered. One may, with equal force, say that when a pound of oleomargarine is just as good in every respect as a pound of butter, it is utterly immaterial to the purchaser which he gets. But it is well settled that laws may properly be passed to protect both purchaser and consumer against deception.

It may be conceded that the manufacture and sale of oleomargarine should be restricted only in so far as to insure its being wholesome and nourishing; that free rein should be given to the manufacturer to produce an imitation of butter that is perfect as to all its qualities, including that which appeals to the eye; that a substitute for butter, equally good, which could be had at a much cheaper price would be a blessing to the consumer in these times of high prices; that the poor consumer who is not able to buy "golden" butter should not be compelled to advertise his poverty to the guest or neighbor who happens to drop in at meal time, and sees some ordinary whitish oleomargarine on the table. But these, and other suggestions of like kind, are all arguments properly addressed to the legislators, who undoubtedly know that, while consumers, without doubt, desire to have the price of such a necessary article of food as butter reduced by the manufacture and sale of cheaper substitutes, nevertheless their

taste rebels at eating the latter. Nearly all of us want "the other fellow" to eat the oleomargarine, while we eat the butter. Courts have no right to invalidate or emasculate statutes, because deemed unwise or inexpedient.

Nor should it be held that there is no violation of the statute, if the product can be made in imitation of yellow butter without the addition or use of any coloring matter, not a necessary constituent. The legitimate aim of the legislature by this law was, no doubt, to so regulate the manufacture and sale of oleomargarine that, if the consumer desired protection against deception, he should have it in the color of the compound. The law may be said to amply protect the purchaser, and also, to a certain extent, the consumer by provisions of labels, placards, and notices where the product is served. But people do not always conform to law, and especially is this true when you reach small eating places and private boarding houses; and it is certainly within the province of the legislature to add this further regulation, so that we may know, if we care so to do, that when we eat what looks like yellow butter we are not eating oleomargarine. The design in the law being to give notice, as far as it may well be given by way of color or appearance to the eye, that the oleomargarine allowed to be manufactured and sold is not butter, we must eliminate the interpretation that violation depends on how the yellow color was produced. There are harmless dyes or colors which do not at all affect the wholesome qualities of the food products to which they may be added. The provision under consideration was not aimed at the means by which the yellow appearance in the compound is obtained, but rather at the result.

Appellant also contends that if the law be construed to prohibit the manipulation of the ingredients in the manufacture, so that the yellow butter color is obtained, there is no certainty or uniform basis upon which to place a conviction. Jurors have different ideas of shades of yellow in butter; and a jury in one case or one locality may find the sale of the product a violation which a jury in another case or in another locality may find the opposite. But, if the interpretation is given that ingredients in the act refer to dyes or sub-

stances introduced into the compound for the sole purpose of giving color, the suggested difficulty is obviated.

While we appreciate the force of this claim, it appears to us that the construction contended for, as hereinbefore stated, would render ineffectual the object sought to be attained by the law, namely, that the consumer may judge from the appearance of what he partakes whether it be ordinary yellow butter or oleomargarine. Moreover, in regulatory statutes of this nature, the line of demarcation between the forbidden and the permissible is not always easy to find. For example, it is criminal to run an automobile at a greater speed than is reasonable. This leaves it so that one jury may find the speed of twenty-five miles an hour an offense, while another jury may fail to so find under the same conditions. This may render the result of the prosecution doubtful; but we do not think the statute is thereby rendered void.

The case of State v. Hammond Packing Co. 105 Minn. 359, 117 N. W. 606, should not be considered out of harmony with the views herein expressed. By the stipulation in that case, it was made to appear that there was no design in selecting the ingredients to obtain butter color. Furthermore, it did not appear that the white could be as readily manufactured as the yellow from essentially the same ingredients. The court says: "In order to sustain this, a criminal prosecution, there must have been evidence of intent that the oleomargarine was made or colored to imitate yellow butter." The expression is used "*made* to imitate yellow butter."

In the case of Meyer v. State, 134 Wis. 156, 114 N. W. 501, 14 L.R.A.(N.S.) 1061, under a law similar to ours, it was held that the state must show a conscious imitation of yellow butter, but that it is immaterial whether this be done by the addition of a dye or by the selection of ingredients. State v. Armour Packing Co. 124 Iowa, 323, 100 N. W. 59, 2 An. Cas. 448, is also an instructive case, but goes so far as to hold that no intent to imitate yellow butter need be shown. If the product imitated yellow butter, the law was violated.

The case of People v. Arenberg, 105 N. Y. 123, 11 N. E. 277, 59 Am. Rep. 483, holds that an intentional imitation of dairy butter

by the addition of harmless coloring matter, not essential to the compound, shows a violation of the law; but the question is not presented whether or not an intentional selection, manipulation, and combination of the essential ingredients of oleomargarine, so as to simulate butter color, does not also show a violation.

The case of Bennett v. Carr, 134 Mich. 243, 96 N. W. 26, holds that an act in that state, prohibiting the sale of any product in imitation of yellow butter, does not prevent the sale of oleomargarine, the yellow color of which is produced naturally from its food ingredients. But the court arrives at this conclusion on the ground that when the statute was enacted "the only method in use in causing the oleomargarine to look like yellow butter was the introduction of some extraneous coloring matter. This was the mischief to be remedied." A prior statute, not repealed, defined the oleomargarine which could be made and sold. With this statute, defendant had complied. Construing the two statutes together, the ruling above stated was made.

It appears to me that the law should be given effect. If that be done, it must be conceded that defendant had a fair trial, and the conviction should be affirmed.

I am authorized to say that Mr. Justice PHILIP E. BROWN concurs in this dissent.