# R. W. ENGSTROM v. DULUTH, MISSABE & NORTHERN RAILWAY COMPANY.[1]

November 24, 1933.

No. 29,756.

[1]Reported in 251 N. W. 134.

*Clarence J. Hartley* and *Dennis F. Donovan,* for appellant.
*John M. Gannon,* for respondent.

HOLT, Justice.

Defendant appeals from the order denying its motion in the alternative for judgment notwithstanding the verdict or a new trial.

At Culver, about 22 miles northwest of Duluth, a state trunk highway crosses almost at right angles the two parallel railroad tracks of defendant. It is a graveled highway running east and west as it crosses the tracks. Culver is located on the slope of a hill slanting west. The distance from center to center of the two railroad tracks, along the center of the highway, is 60.2 feet. The east track is 5.34 feet higher than the west track. The grade of the highway for 40 feet between the tracks is 10.85 per cent (it is assumed that about 7½ feet on the outside of each rail is level). The graveled roadway of the highway is about 20 feet wide. The descent west from the west track is 8.82 per cent for the first 150 feet, then somewhat less for the next 150 feet. There was a row of 6-inch tamarack guard posts on either side of the 20-foot roadway west of the west track, the highway there being on an embankment. On the east of the railroad right of way the highway towards Duluth is slightly down grade for some 20 feet, then about level for about 60 feet, and then up grade nearly 8 per cent for about 800 feet to the top of the hill. The highway is straight all the way down the hill.

Plaintiff, a farmer living near Grand Rapids, and one Hafer, a neighbor, took two cattle in a Chevrolet one-ton truck to Duluth in the forenoon of July 28, 1932. They did not start on the return trip until about ten o'clock at night. A young man from Duluth, who was to work for plaintiff, rode back with them. The cab of the truck was long, seating all three. Plaintiff's evidence was to the effect that in the morning he noticed a sag or rut running from either edge of the roadway toward the center thereof and two to four feet east of the west track. A witness for plaintiff described the rut thus: "Coming from the east towards the west on the lower track and on the north side of the road there was a rut, oh, about six or seven feet long and probably four or five inches deep, and probably from 18 to 20 inches wide." This refers to a sag or rut parallel to the rail on the south side of the highway. There was a similar rut, not quite so long, on the north side of the roadway. In the morning plaintiff avoided this by straddling the center. It is the claim of plaintiff that on his trip home, as he reached the top of the hill approaching Culver, the truck's speed was 25 miles an hour; that on going down the hill he applied the brakes several times, reducing the speed to 18 or 20 miles an hour; that in going over the east track down the incline into the sag just mentioned, east of the west track, he lost control of the truck so that the hub of the left front wheel hit the fourth guard post on the left side, mowed down the next five posts, and landed at the foot of the embankment. The truck was practically destroyed, and plaintiff was severely and permanently injured. The negligence with which defendant was charged was that, in violation of statute, the parallel tracks were maintained at different levels and that the approaches between the tracks were negligently allowed to become rutty or saggy. In addition to a general denial, the answer alleged contributory negligence and the assumption of the risk. The verdict was for plaintiff.

One of the contentions of defendant is that under the constitution (art. 16) the maintenance of a state trunk highway is laid wholly on the state and that a trunk highway does not cease to be such when on grade it crosses a railroad right of way. Hence it is

claimed that defendant has no duty to perform in regard to the maintenance of the highway where it intersects the tracks at Culver. When it is recalled that before art. 16 was adopted it had been definitely settled, not only by the decisions of this court but by the United States Supreme Court, that it was the uncompensated duty of the railroads to construct and maintain a safe roadway for vehicular travel wherever their tracks intersect a public highway, it is not thinkable that in adopting that article the people intended to assume the burden so firmly fastened upon the railroads. This duty extended to the entire right of way in a city or village where, for instance, public safety and convenience required the same to be paved or to have sidewalks extended across it. State ex rel. Village of Clara City v. G. N. Ry. Co. 130 Minn. 480, 153 N. W. 879, L. R. A. 1918D, 1153, where the decisions in this court and the United States Supreme Court are cited; State ex rel. City of Fairmont v. C. St. P. M. & O. Ry. Co. 148 Minn. 91, 180 N. W. 925. After the adoption of art. 16, L. 1921, c. 323, was enacted to carry the trunk highway system into effect, and it expressly repealed many statutes. But two, in effect since 1911, are still in 1 Mason Minn. St. 1927, viz:

"4735. Every railroad company in this state shall keep well planked and in a safe and passable condition every crossing over any public highway, and whenever any such railroad company shall have changed or raised the grade of its tracks at any such crossing it shall also grade the approaches on each side so as to make the approach and crossing of such tracks safe and easy for teams with loads and other vehicles.

"4736. Whenever any such railroad companies have more than one track, crossing such highways, it shall be unlawful to raise or maintain one such track at a higher grade than the other tracks and shall cause all such tracks to be raised or lowered to about the same level so as not to endanger the safe passage of teams and other vehicles over such tracks at such crossings."

These enactments are in virtue of the police power of the state to protect the public. It is for the safety of travelers not only on the highways but also for those on the trains. The fact that by

L. 1921, c. 323, § 17 (1 Mason Minn. St. 1927, § 2558), the commissioner of highways is given authority to prescribe reasonable rules and regulations for the construction and maintenance of a railroad, or any other public utility, along or across trunk highways, does not relieve from the duty imposed by said §§ 4735 and 4736. It is also reasonable that the railroads, responsible for the adequacy of the roadbed, ties, and rails, and for the use to which the same are put, should construct and maintain the same. Planking between the rails and keeping the track clear and fit for the safe passage of trains cannot be well left to the highway department. Defendant contends that, although the record does not show that the state highway commissioner has issued any rules or regulations regarding this or any crossing, it should be presumed that the raising of the east track was with the consent of the highway commissioner or according to his promulgated rules. We think such presumptions should not be indulged in in face of positive statutes prohibiting the creation of such a situation as here existed. That the violation of these statutes could by the jury be found to create danger to the safe crossing of the tracks by motor vehicles must be admitted. Moreover, the violation of a statute of this sort, enacted for the protection of users of public highways, is *per se* negligence. We have not here a case where the railroad carries its tracks on a viaduct over a trunk highway which is extended across the railroad right of way underneath. In such a case no structure of the railroad interferes with the construction or maintenance of the highway. Murphy v. G. N. Ry. Co. 189 Minn. 109, 248 N. W. 715. The fact that the highway department assumed the maintenance of the incline between the tracks did not relieve defendant, since it had the duty to see that the roadway was properly maintained where the alleged sags were. Crist v. M. St. P. & S. S. M. Ry. Co. 162 Minn. 1, 202 N. W. 57. Defendant's negligence was for the jury.

Defendant contends that as a matter of law plaintiff's contributory negligence and assumption of risk appear from the record, and hence it is entitled to judgment notwithstanding the verdict. It is a close question. Plaintiff was familiar with the road and

testified that he considered it dangerous to travel in the dark, and, therefore, when occasion required him to drive home from Duluth in the nighttime, he took the longer paved road via Hibbing. On this trip he assigns as a reason for returning via Culver that he desired to see some person at Floodwood, about 25 miles west of the place of accident. However, it is rather strange that he should tarry in Duluth all afternoon to see a person on the way home at the midnight hour. He attributes the accident to the sags or ruts just east of the west track, which he saw and avoided in the morning by straddling the center of the roadway. He testified that on his way home down the hill to the place where he lost control of the truck he was straddling the center of the road and going no faster than 18 to 20 miles an hour on the hill; that he used his foot brake at times; that the brakes were in good order and the headlights strong; and that he lost control going down the incline between the two tracks into the ruts or sags mentioned. There was testimony from others that they drove safely down this hill with cars and buses at the speed of 20 to 25 miles an hour. It was not developed clearly in what manner plaintiff lost control. The road was dry and graveled. It is only on the assumption that loss of control involved the slipping of the foot from the brake to the accelerator that might explain why the truck could not be stopped before cutting down five 6-inch posts and running over 100 feet. It is to be noted that in approaching the east track down the hill the truck ran on level ground for about 60 feet, then slightly upgrade for some 20 feet. This situation of the roadway prevented the headlights from disclosing the steep incline of 10.85 per cent between the tracks and the alleged ruts or sags directly east of the west track. A severe jolt would be experienced by a car, and perhaps more severely by a truck, dropping down so steep an incline against the level west track—a three per cent steeper grade than any other part of the hill. There could, of course, have been no reasonable claim by plaintiff that either the position of the railroad tracks or the alleged ruts or sags could have caused the ordinary careful driver to lose control of the truck if the speed had been reduced so as to conform to 1 Mason Minn. St. 1927, § 4743-8. But

neither in the trial nor here has the bearing of that statute been invoked by defendant, and we leave it out of consideration, since there must be a new trial on another ground. It is enough to say that as the record now stands we think plaintiff's contributory negligence and assumption of risk were for the jury.

A new trial was asked upon the ground of newly discovered evidence. This was properly denied, for the court could well conclude that by the exercise of due diligence the evidence could have been produced at the trial had.

We think there was misconduct of a juror, Mrs. Aakhus, participated in by plaintiff, which requires a new trial. The juror did not live at the county seat. Necessity compelled her to bring her one-year old child along. So she had to obtain quarters where she could leave the child during the hours she had to be in court. A day before she was selected to serve in this case she made arrangements to stay at the home of Mr. and Mrs. Powell, paying one dollar for herself and baby. She was acquainted with Mrs. Powell and assisted in wiping dishes during her stay. Mrs. Powell took care of the baby while Mrs. Aakhus was at the courthouse. Mr. Powell was the stepson of plaintiff and one of his witnesses. Plaintiff and his wife dined each day during the trial with the juror at the Powell home. The trial started March 31, this year, and the verdict was rendered April 3. The juror appreciated that she was exposed to outside influence and, as soon as she was selected as a juror, requested those who met at the Powell home that the case be not discussed. The learned trial court was of the opinion that there had been no improper conduct of the juror and no effort to influence her. This may be true. But where circumstances develop a situation like the one in which this juror is found, in a case where the issues on trial are exceedingly close, the unconscious influence exerted by the mere presence of one of the parties, his relatives and witness at table with the juror in the private home of such party's relative and witness may resolve the issues in such party's favor with such juror. That, however, is not the main consideration. To maintain the confidence of the people in the administration of justice, under the jury system, it is absolutely essen-

tial that the greatest care be exercised by the courts so that a situation may not arise where either litigants or the public can rightfully suspect the integrity of verdicts. We submit that no defeated litigant could ever be satisfied that he has had a fair trial where he finds that a juror during such trial lodged at the home of a near relative of the prevailing party and there took his meals with the latter. Whether the unintentional misconduct of a juror not participated in by the prevailing party should result in a new trial is generally left to the sound discretion of the trial court. See Brecht v. Town of Bergen, 182 Minn. 603, 235 N. W. 528, and the cases therein cited. But here plaintiff participated to a certain extent in creating the improper situation, even though he did not do so designedly. He saw and knew that the juror was quartered in his stepson's home, and yet he and his wife continued to there take their noonday meals with the juror during the whole trial. It was not a public boarding house. We think this presents misconduct comparable in principle to that appearing in State v. Snow, 130 Minn. 206, 153 N. W. 526, and Magnuson v. Bouck, 168 Minn. 39, 209 N. W. 896, where it was held an abuse of discretion not to award a new trial. Somewhat like situations constrained the trial court to grant a new trial in Akin v. Lake Superior Cons. Iron Mines, 103 Minn. 204, 114 N. W. 654, 837; Hillius v. Nelson Hotel Co. Inc. 188 Minn. 336, 247 N. W. 385. See also Village of Bangor v. Hussa C. & P. Co. 208 Wis. 191, 242 N. W. 565.

We think the exception is well taken to this part of the charge:

"It is the law of this state that if any person rashly and recklessly and unnecessarily exposes himself to an imminent and known danger in a manner that a person of ordinary prudence would not under the same or similar circumstances he is guilty of negligence himself and cannot recover."

It is obvious that this places a greater burden on defendant to prove contributory negligence or assumption of risk than the law demands.

Other errors assigned are not likely to arise at another trial, and we deem it unnecessary to discuss them.

The order is reversed, and the case is remanded for a new trial.